**FEDERAL ELECTION COMMISSION,**
**Plaintiff-Appellant,**

v.

**HALL–TYNER ELECTION CAMPAIGN**
**COMMITTEE, et al.,**
**Defendants-Appellees.**

No. 963, Docket 81–6229.

United States Court of Appeals,
Second Circuit.

Argued April 16, 1982.

Decided May 6, 1982.

---

Richard B. Bader, Asst. Gen. Counsel, Federal Election Commission, Washington, D. C. (Charles N. Steele, Jeffrey H. Bowman, Miriam Aguiar, Washington, D. C., of counsel), for plaintiff-appellant.

John J. Abt, New York City (Jeffrey Schwartz, New York City, of counsel), for defendants-appellees.

Victor Rabinowitz, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for amicus curiae National Emergency Civil Liberties Committee.

Arthur Eisenberg, New York City, Joel Gora, Brooklyn, N. Y., for amicus curiae New York Civil Liberties Union.

Before KAUFMAN, VAN GRAAFEILAND, Circuit Judges, and LOWE,* District Judge.

IRVING R. KAUFMAN, Circuit Judge:

Anonymity has long been essential to uninhibited political activity in a democratic society. The secret ballot ensures that no one must answer for the vote he casts. Confidentiality prevents the apprehension of reprisal that threatens to suppress the robust interchange of ideas at the core of the First Amendment's guarantee of free speech and protection of privacy in association. A society confident in its stability does not fear the voice of opposition. Indeed, unafraid of dissent, we recognize our ability to exhibit special indulgence to nurture the free expression of minority views. Realizing that mere identification with certain disfavored ideologies can result in harassment which may silence those voices, the Constitution protects private support of political associations.

Today we are asked to determine whether, in this instance, the Constitution demands that a particular minority political group be exempted from certain disclosure and recordkeeping requirements to safeguard the privacy which is essential to the right of association of its members. This group, the Hall-Tyner Election Campaign Committee ("Committee"), supported the campaign of the candidates of the Communist Party, U. S. A., Gus Hall and Jarvis Tyner, in their drive to be elected President and Vice-President of the United States, respectively, in the 1976 national elections. The Federal Election Commission ("FEC") would have us find that the Committee and its Treasurer, Frances Bordofsky, must reveal the names and maintain records of contributors to its campaign coffers in the 1976 presidential election. Judge Gagliardi,

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

granting summary judgment in favor of the Committee, held that the disclosure and recordkeeping requirements of the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.*, could not constitutionally be applied to the Committee and Bordofsky.[1] We agree, and for the reasons set forth below, we affirm.

## I

The Federal Election Campaign Act ("FECA") imposes numerous restraints upon individuals and groups engaged in political activities relating to national elections.[2] At issue here is the applicability of the Act's recordkeeping and disclosure requirements to the Committee and Bordofsky. The literal terms of FECA required Bordofsky to maintain records specifying the name and address of each person who had contributed more than $50 to the Committee, and the name, address, occupation and principal place of business of each person contributing an amount in excess of $100.[3] On its face, the Act also mandated that the information concerning those who had contributed more than $100 be reported to the Federal Election Commission.[4]

On March 5, 1976, in response to a request from Bordofsky, the general counsel of the Committee, John J. Abt, rendered a written opinion that the recordkeeping and disclosure requirements of FECA were unconstitutional as applied to the Committee and its treasurer, Bordofsky. Pursuant to Abt's opinion, the Committee advised all potential contributors that they might, if they so desired, make their contributions anonymously, in which case the Committee would neither record nor report their names. In reports filed with the Federal

Election Commission between April 10, 1976 and April 10, 1979, the Committee acknowledged financial contributions of $423,893.62. The itemized receipts included 76 contributors listed by name and 424 contributors listed as "anonymous."[5]

After an unsuccessful attempt to persuade the Committee to comply with the requirements of FECA, the Federal Election Commission instituted this civil enforcement action pursuant to 2 U.S.C. § 437g(a)(5)(B). The Committee conceded that it had failed to comply with the Act. It argued, instead, that the recordkeeping and disclosure requirements were unconstitutional as applied to the Committee and Bordofsky on the ground that such application would abridge the First Amendment freedom of association rights of the Committee's supporters.

Upon cross-motions for summary judgment, Judge Gagliardi dismissed the FEC's complaint, holding that the recordkeeping and disclosure provisions of FECA are unconstitutional as applied to the Committee. He described the test for determining whether the application of the challenged portions of the FECA to the Committee could pass constitutional muster by applying the standards established in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Specifically, he recognized the ultimate question to be answered is whether the undisputed evidence in the record establishes, as a matter of law, a reasonable probability that compelled disclosure of the names of contributors " 'will subject them to threats, harassment, or reprisals from either Government officials or private parties?' " *Federal Election Comm'n v. Hall-Tyner Election Campaign*, 524 F.Supp. 955,

---

1. *See Federal Election Comm'n v. Hall-Tyner Election Campaign Comm.*, 524 F.Supp. 955 (S.D.N.Y.1981).

2. FECA was amended by the Federal Election Campaign Act Amendments of 1979, Pub.L.No. 96–187, 93 Stat. 1339 (1980) effective after the alleged violations in this case. All citations are to the statute as codified prior to the 1979 amendments. Every candidate for federal office must designate a "principal campaign committee" which is charged with complying with the statutory requirements discussed below. 2

U.S.C. § 432(e). The Hall-Tyner Election Campaign Committee served as the principal campaign committee for the candidacies of Gus Hall and Jarvis Tyner in 1976.

3. 2 U.S.C. § 432(c).

4. 2 U.S.C. § 434(b)(2).

5. These receipts were listed on Schedule A of FEC Form 3.

958 (S.D.N.Y.1981). The evidence relied on by the district judge included the extensive body of state and federal legislation subjecting Communist Party members to civil disability and criminal liability, reports and affidavits documenting the history of governmental surveillance and harassment of Communist Party members, as well as affidavits indicating the desire of contributors to the Committee to remain anonymous. Based on this evidence, the judge concluded that there existed a reasonable probability of harassment of identified contributors to the Committee who were, in fact, sponsoring candidates of the Communist Party.

Clearly, this undisputed evidence demonstrated that mandatory disclosure and recordkeeping would discourage numerous individuals from contributing to the Committee on the basis of the reasonable probability that they would later be subjected to governmental or private harassment and rebuke. Accordingly, we decline to apply the recordkeeping and disclosure provisions of FECA to the Committee for such requirements would violate the First Amendment of the Constitution.

## II

The genesis of our holding lies in an analysis of the extent to which the Government may regulate election practices and procedure when such controls threaten to unreasonably impair the rights of privacy of association and belief guaranteed by the First Amendment. Our task is somewhat simplified because we do not write on a *tabula rasa*. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court comprehensively assessed the constitutionality of FECA.[6] The Court concluded that although the disclosure provisions of FECA were not unconstitutional on their face, they might well be unconstitutional as applied to particular disfavored minority parties or groups. To apply the teachings of *Buckley* we must begin with a review of the constitutional and doctrinal trends which have shaped the contours of First Amendment protections for those with unpopular views who venture into the arena of political debate.

Free speech would be a hollow right indeed if it meant only that the majority remained free to express thoughts consistent with conventional wisdom. The principle of free expression requires that all groups remain unfettered when expounding their ideologies, regardless of how universally disfavored or repugnant those opinions may be. In his first Inaugural Address nearly two centuries ago, Thomas Jefferson eloquently phrased this fundamental precept:

If there be any among us who would wish to dissolve this Union or change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it.[7]

The diversity of thought which our Nation cherishes is at the core of our intellectual richness. The First Amendment represents a faith in the ability of the public to discard dangerous or erroneous policies, and a belief that the Republic is strengthened by an uninhibited competition of ideas. As Justice Holmes taught, the theory of our Constitution is that "the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market ...." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919)

---

**6.** The Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), considered the provisions of FECA as they existed prior to the 1976 amendments. The recordkeeping requirements at that time related to all contributions in excess of $10. In 1976, the threshold amount was raised to $50. Pub. L.No.94–283, § 103(b), 90 Stat. 480 (1976).

**7.** The belief that the opposition need not be silenced because truth will ultimately triumph has been shared by well recognized and thoughtful writers. *See e.g.*, J. Locke, A Letter Concerning Toleration 151 (J. W. Gough ed. 1948) ("For the truth certainly would do well enough if she were left for herself."); J. Milton, Areopagitica 78, 126 (J. C. Suffolk ed. 1968) ("[W]ho ever knew truth put to the worse, in a free and open encounter?").

(Holmes, J., dissenting).[8] Tolerance of the unpopular and disagreeable is the hallmark of a truly free society.[9]

There is a paramount public interest in maintaining a vigorous and aggressive political system which includes even participants whose ideologies are abhorrent to that system. This principle repels totalitarianism and the rise of dictators by permitting even those whose views are anathema to ours to partake in the dynamics of an open and vigorous election without fear of reprisal.

Acknowledging the importance of fostering the existence of minority political parties, we must also recognize that such groups rarely have a firm financial foundation. If apprehension is bred in the minds of contributors to fringe organizations by fear that their support of an unpopular ideology will be revealed, they may cease to provide financial assistance. The resulting decrease in contributions may threaten the minority party's very existence. Society suffers from such a consequence because the free flow of ideas, the lifeblood of the body politic, is necessarily reduced. Accordingly, a nation dedicated to free thought and free expression cannot ignore the grave results of facially innocuous election requirements.

The power of a government to repress dissent is substantial and can be exercised in a myriad of subtle ways. Privacy is an essential element of the right of association and the ability to express dissent effectively. As a result, removing the cloak of anonymity from a political committee by requiring it to disclose the names of those who purchase its publications threatens important First Amendment values. Such forced revelations would likely lead to "vexatious inquiries" which consequently could instill in the public an unremitting fear of becoming linked with the unpopular or the unorthodox. *United States v. Rumely*, 345 U.S. 41, 56–58, 73 S.Ct. 543, 550–51, 97 L.Ed. 770 (1953) (Douglas, J., concurring).

A unanimous Supreme Court in *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), fashioned its decision with this doctrinal tool when it held that the NAACP could not be compelled to deliver to the Alabama Attorney General the names and addresses of its members and agents in the State of Alabama. Recognizing "the vital relationship between freedom to associate and privacy in one's associations," *id.* at 462, 78 S.Ct. at 1171, the Court declared that the constitutional prohibition against mandatory identification of supporters is particularly strong when the group is associated with unpopular positions: "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.*

These principles have consistently been reaffirmed as courts protect freedom of association not only against direct attack, but against inroads by the insidious interference that often follows public identification with controversial organizations. In sustaining a constitutional challenge to a coerced disclosure of NAACP membership lists, for instance, the Supreme Court reasoned that the evidence indicated that the government's action represented a substantial encroachment upon the right of privacy of association. *Bates v. Little Rock*, 361

---

8. *See Williams v. Rhodes*, 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968) ("There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms").

9. Our commitment to these principles has been demonstrated on innumerable occasions. The Supreme Court has insisted that the procedural safeguards required of a State seeking to enjoin a demonstration be rigorously followed, even when the group targeted is Nazis, intent on preaching hatred and antisemitism, *National Socialist Party v. Village of Skokie*, 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977) (per curiam). Similarly, the Court has held that a leader of the Ku Klux Klan may not be convicted for advocating the use of force unless the advocacy is directed to inciting "imminent lawless action." *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). The adverse impact that publication of the lists would have on membership caused particular concern, for the NAACP had suffered significant harassment in the past. *Id.* at 524, 80 S.Ct. at 417.

■ Emanating from these cases is a fundamental tenet of First Amendment jurisprudence. Because compelled disclosure can seriously impair the right to privacy of association and belief, it is permissible only upon a showing of a compelling state interest. *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 546, 83 S.Ct. 889, 893, 9 L.Ed.2d 929 (1963). With these principles firmly in mind, we turn to the Supreme Court's consideration of the broad challenge to FECA in *Buckley v. Valeo, supra.*

### III

In *Buckley v. Valeo, supra,* the Supreme Court was presented with a sweeping facial challenge to the heart of the central provisions of the 1974 Amendments to the Federal Election Campaign Act. Included was an overbreadth challenge to the constitutionality of the Act's disclosure requirements. The Court reaffirmed the time-honored doctrine that statutorily mandated disclosure must be justified by a compelling governmental interest and that there must be a "substantial relation" between the governmental interest [10] and the information required to be revealed. 424 U.S. at 64, 96 S.Ct. at 656.

Although the Court held that there was a sufficient correlation between governmental interests and the required disclosures to survive a facial attack, it also recognized that the result might well be different when the disclosure was sought from a minority party: "[T]he governmental interest in disclosure is diminished when the contribution in question is made to a minor party with little chance of winning an election." *Id.* at 70, 96 S.Ct. at 659. Tacitly acknowledging the necessity of fostering the stability and existence of minority parties, the Court articulated a flexible rule: When a minority party demonstrates a reasonable probability of harassment caused by disclosure, FECA's requirements cannot constitutionally be applied to the party.[11]

■ In assessing the evidence of harassment in this case, we note that *Buckley* did not impose unduly strict or burdensome requirements on the minority group seeking constitutional exemption. A minority party striving to avoid FECA's disclosure provisions does not carry a burden of demonstrating that harassment will certainly follow compelled disclosure of contributors' names. Indeed, when First Amendment rights are at stake and the spectre of significant chill exists, courts have never required such a heavy burden to be carried because " 'First Amendment freedoms need breathing space to survive' ". *Keyishian v. Board of Regents*, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967), *quoting NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Breathing space is especially important in a historical con-

---

**10.** The Court specified three governmental interests thought to be served by the disclosure requirements. Disclosure of the sources of political campaign funds assists voters in ascertaining the political proclivities of candidates. In addition, it deters corruption by exposing large contributions that might otherwise influence the recipient to deliver secret post-election favors should he win the election. Finally, disclosure facilitates the detection of violations of the FECA contribution limitations. *Buckley v. Valeo, supra*, 424 U.S. at 66–68, 96 S.Ct. at 657–58.

**11.** Responding to the concern that harassment is often illusive and difficult to prove, the Supreme Court stated that minority parties "must

be allowed sufficient flexibility in the proof of injury." *Buckley v. Valeo, supra*, 424 U.S. at 74, 96 S.Ct. at 661. This flexibility meant that:

> The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties. The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient. *Id.*

text of harassment based on political belief. Our examination of the treatment historically accorded persons identified with the Communist Party and a survey of statutes still extant reveal that the disclosure sought by the FEC would have the effect of restraining the First Amendment rights of supporters of the Committee to an extent unjustified by the minimal governmental interest in obtaining the information.[12]

Numerous statutes purport to subject members of the Communist Party to both civil disabilities and criminal liability. For example, the Communist Control Act, 50 U.S.C. § 841 *et seq.*, declares that the Communist Party of the United States "is in fact an instrumentality of a conspiracy to overthrow the Government of the United States." The preamble to this Act concludes with the statement that "the Communist Party should be outlawed." The statute further provides that "whatever rights, privileges, and immunities which have heretofore been granted to said [Communist] party or any subsidiary organization by reason of the laws of the United States or any political subdivision thereof, are terminated." *Id.* at § 842. In addition, the rights and benefits of our national equal employment opportunity laws do not cover any "individual who is a member of the Communist Party of the United States." 42 U.S.C. § 2000e–2(f). Moreover, by statute, a naturalized citizen can have his citizenship revoked, 8 U.S.C. § 1451(c), and can be deported, 8 U.S.C. § 1251(a)(6)(C), for membership in the Communist Party.

Several states also have enacted laws which place supporters of the Committee in danger of legal sanctions or harassment if their ties with the Communist Party should be made public. It is still illegal in many states simply to be a member of the Communist Party.[13] Contributions to the Communist Party are also proscribed by many state statutes.[14]

These laws, drafted by Congress and the legislatures of the various states, are an ever-present threat of reprisal to those who contribute to the Committee. It is of little moment that prosecutions under these laws are rare and that these statutes may currently lie dormant.[15] Surely, it is not inconceivable that a statute long ignored may suddenly be resurrected and employed in a criminal prosecution. *Compare Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) *with Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Moreover, although a penal statute may not be enforced, First Amendment freedoms may still suffer from its lingering presence. *See Epperson v. Arkansas,* 393 U.S. 97, 101–02, 89 S.Ct. 266, 268–69, 21 L.Ed.2d 228 (1968).

The Final Report of the Select Committee to Study Governmental Operations with

---

**12.** *See Buckley v. Valeo, supra,* 424 U.S. at 70–71, 96 S.Ct. at 659.

**13.** *E.g.,* Fla.Stat. § 876.02(5) (1976); Mass.Ann. Laws ch. 264, §§ 16A, 17, 19 (Michie/Law. Co-op. 1980); Okl.Stat. tit. 21, § 1266.4(4) (1961); Tex.Rev.Civ.Stat.Ann. art. 6889–3A, § 5(4) (Vernon 1960).

**14.** *E.g.,* Mass.Ann. Laws ch. 264, § 23 (Michie/Law. Co-op. 1980); Okl.Stat. tit. 21, § 1266.4(4) (1961); Tex.Rev.Civ.Stat.Ann. art. 6889–3A, § 5(4) (Vernon 1960).

**15.** The FEC points out that some of the statutes directed at members of the Communist Party have been declared unconstitutional by the courts. *See, e.g., Boorda v. Subversive Activities Control Board,* 421 F.2d 1142 (D.C.Cir. 1969), *cert. denied,* 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970) holding unconstitutional the disclosure provisions of the Subversive Activities Control Act. This misses the point for three reasons. First, these statutes are significant as a reflection of popular will and therefore evidence popular animus against the Communist Party. Second, many of these statutes have not been declared unconstitutional and may be used in the future by a zealous prosecutor. The right of free speech can be trampled or chilled even if convictions are never obtained. Finally, the statutes may be reinterpreted to avoid the direct constitutional infirmity. *See, e.g., People v. Epton,* 19 N.Y.2d 496, 281 N.Y.S.2d 9, 227 N.E.2d 829 (1967), *cert. denied and appeal dismissed,* 390 U.S. 29, 88 S.Ct. 824, 19 L.Ed.2d 808 (1968) (New York's criminal anarchy statute reinterpreted to avoid its unconstitutionality in a case where the president of a communist club was prosecuted.).

Respect to Intelligence Activities, S.Rep.No. 755, 94th Cong., 2d Sess. (1976) ("Senate Report"), details the extensive governmental surveillance and harassment long directed at the Communist Party and its members. The Senate Report reveals a Federal Bureau of Investigation counterintelligence program known as "CPUSA COINTEL-PRO" which involved the mailing of anonymous letters to employers and spouses of suspected Party members as well as the instigation of IRS investigations of their federal tax returns. Although the CPUSA COINTELPRO program was terminated in 1971,[16] the record in this case includes an affidavit by the Assistant Director of the Intelligence Division of the FBI stating that the Communist Party of the United States remains under active investigation by the FBI. This acknowledgement of continuing FBI surveillance merits substantial weight in any evaluation of the chilling effect the FECA disclosure requirements may impose upon cherished First Amendment freedoms.

In light of this telling evidentiary background, it is not surprising that the Committee received contributions from individuals only after an assurance of anonymity.[17] The stigma arising from public disclosure, which causes potential supporters of an organization to refrain from engaging in protected activity, emphasizes the danger to First Amendment rights posed by disclosure requirements. *See Shelton v. Tucker*, 364 U.S. 479, 486–87, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). When fear of injury that is neither imaginery nor speculative discourages the exercise of valued and revered First Amendment rights, courts must intercede. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 301–03, 99 S.Ct. 2301, 2310–11, 60 L.Ed.2d 895 (1979).

As we have noted, to hold that the FECA disclosure provisions may not be appropriately applied to the Committee, it is not necessary to conclude that people identified as supporters of the Communist Party will beyond question be harassed. The test given us by the Supreme Court is that we need only find a "pattern of threats or specific manifestations of public hostility . . . ." *Buckley v. Valeo, supra*, 424 U.S. at 74, 96 S.Ct. at 661. We believe that the evidence adduced amply meets this standard and, in addition, sufficiently demonstrates a substantial infringement of the right of privacy of association and belief not justified by the Government's relatively insignificant interest in disclosure. *See id.* at 70, 96 S.Ct. at 659. It is clear in the circumstances presented here that "the public opprobrium and obloquy which may attach to an individual [identified] as a member of a Communist-action organization is no less considerable than that . . . in *N.A.A.C.P.* and *Bates.*" *Communist Party of the United States v. Subversive Activities Control Board*, 367 U.S. 1, 102, 81 S.Ct. 1357, 1413, 6 L.Ed.2d 625 (1961).

Only a few words need be added on the recordkeeping requirements. The Federal Election Commission suggests that this provision can be applied to the Committee even if the disclosure demand cannot. We disagree. It is clear that the ultimate thrust of the recordkeeping requirement is the likelihood of eventual review and oversight by the Government. *See* 2 U.S.C. § 438(a)(8) (FEC authorized to conduct audit and field investigations). Indeed, to the extent that these records are never disclosed or obtained by anyone outside the Committee, there is little governmental interest served. The impact on the right of privacy of association by the recordkeeping requirement is as severe as that caused by the disclosure provisions. We therefore hold that these statu-

16. Public dissemination of the Senate Report, with its revelation concerning CPUSA COINTELPRO, did not occur until 1976, the very year of concern in this case. The potential chill of this program may very well have been at its zenith just as the Committee was soliciting contributions from people demanding anonymity.

17. The Committee submitted affidavits from twelve individuals who explained that they gave their contributions only after being assured that their names would not be revealed. Bordofsky stated in a separate affidavit that the same was true of most people solicited by the Communist Party.

424

tory terms, like the disclosure requirements, may not be applied to the Committee.

### IV

On another occasion, the Federal Election Commission has been admonished to exercise its authority in a manner harmonious with a system of free expression because an abuse of its power is most repugnant to those who cherish the First Amendment and the unfettered political process it guarantees. *F. E. C. v. Central Long Island Tax Reform Immediately Committee*, 616 F.2d 45, 55 (2d Cir. 1980) (*en banc*). Unfortunately, the Commission has failed to heed this warning.

For the FEC to pursue so vigorously its demand for the names and addresses of the contributors to the Committee in the face of the clear chilling effect this activity will inevitably have is to exhibit an appalling disregard for the needs of the free and open political process safeguarded by the First Amendment. This agency charged with administering a comprehensive statute governing fundamental First Amendment freedoms [18] should tread far more lightly than is apparent here. When dealing with values as fragile and precious as those contained in the First Amendment, special care is required.

18. *See Buckley v. Valeo, supra*, 424 U.S. at 14, 96 S.Ct. at 632.