**FEDERAL ELECTION COMMISSION,**
**Plaintiff, Appellant,**

**v.**

**MASSACHUSETTS CITIZENS FOR LIFE, INC., Defendant, Appellee.**

**No. 84–1719.**

United States Court of Appeals,
First Circuit.

Argued April 2, 1985.

Decided July 31, 1985.

Richard B. Bader, Asst. Gen. Counsel, Washington, D.C., with whom Charles N. Steele, Gen. Counsel, Lisa E. Klein, Washington, D.C., and Carol A. Laham were on brief for appellant.

Francis H. Fox, Boston, Mass., with whom E. Susan Garsh, Alexandra Leake, Robin A. Driskel and Bingham, Dana & Gould, Boston, Mass., were on brief for appellee.

James O'Connell, Sally O'Connell & Fitch, Boston, Mass., Jack C. Landau, Jane E. Kirtley, Washington, D.C., Harry L. Baumann, Steven A. Bookshester, J. Laurent Scharff, Pierson, Ball & Dowd, Washington, D.C., Richard N. Winfield and Rogers & Wells, New York City, were on brief for The Reporters Committee for Freedom of the Press, Nat. Ass'n of Broadcasters, Radio-Television News Directors Ass'n and Associated Press Managing Editors, amici curiae.

James J. Featherstone and Santarelli & Bond, Washington, D.C., on brief for National Rifle Ass'n of America, amicus curiae.

Marjorie Heins, Boston, Mass., and Elaine Millar, on brief for the Civil Liberties Union of Massachusetts, amicus curiae.

Joseph D. Alviani and Marcia Drake Seeler, New England Legal Foundation, Boston, Mass., on brief for Home Builders Assn. of Massachusetts, amicus curiae.

Before BREYER, Circuit Judge, RO-SENN,* Senior Circuit Judge, and TORRU-ELLA, Circuit Judge.

ROSENN, Circuit Judge.

In an effort to curb misuse of corporate funds and preserve integrity in the federal election process, Congress enacted a series of laws prohibiting corporate expenditures and contributions to political campaigns. This appeal presents the question of wheth-

---

* Of the Third Circuit, sitting by designation.

er the current statute, codified at 2 U.S.C. § 441b (1982), prohibits the publication by a non-profit ideological organization of a Special Election Edition containing the voting records of federal candidates on a particular issue of interest to the organization's members and whether such a prohibition may be constitutionally applied in the instant case. The United States District Court for the District of Massachusetts held that the publication was not covered by the statute, and that, in the alternative, prohibition of the publication would violate the organization's first amendment rights, 589 F.Supp. 646 (D.C.Mass.1984). The plaintiff Federal Election Commission (FEC) appealed. We affirm.

## I.

The defendant Massachusetts Citizens for Life, Inc. (MCFL) is a Massachusetts non-profit, non-membership corporation, organized "[t]o foster respect for human life and to defend the right to life of all human beings, born and unborn, through education, political and other forms of activities."

Despite its legal status as a non-membership corporation, the organization claimed three classes of "members" in 1978: "dues paying members" who contributed $15.00 per year to the organization; "contributing members" who contributed money to the organization in amounts less than $15.00 per year; and "non-contributing members" who neither paid dues nor contributed money but who had indicated somehow their support for the organization's goals.

For several years, MCFL published a newsletter at somewhat irregular intervals.[1] "Dues-paying and contributing members" automatically received the MCFL newsletter by mail, as did "non-contributing members" when funds were available. The May 1978 newsletter was mailed to 2,109 people; the mailing list for the October 1978 newsletter contained 3,119 names. The MCFL newsletter typically contained information about MCFL activities, solicitations for volunteers and contributions, material on political, administrative, judicial, and legislative developments, and appeals to members to contact legislators and express their support of the anti-abortion position.

In periods prior to elections, MCFL published "Special Election Editions." In September 1978 it printed 100,000 copies of a publication captioned "Special Election Edition" with headlines reading EVERYTHING YOU NEED TO VOTE PRO–LIFE. The publication contained no masthead identifying it as a special edition of the MCFL newsletter. The MCFL logo did appear at the top of the publication, and the words "Volume 5, No. 3, 1978" appear to have been handwritten in below the logo by someone on the copy supplied to the court by the FEC.

The publication contained the voting records on abortion-related issues of many candidates for federal and state offices. It included at least two exhortations to "vote pro-life" and the statement that "No pro-life candidate can win in November without your vote in September." The publication contained photographs only of those candidates who were considered "pro-life." At the back of the publication, beside the exhortation "Vote Pro-Life," MCFL printed a disclaimer stating "This special election edition does not represent an endorsement of any particular candidate."

Shortly thereafter, MCFL printed and distributed 20,000 copies of a Complimentary Partial Special Election Edition, apparently for the purpose of correcting minor errors in the earlier edition. This edition did not contain a volume and number designation below the MCFL logo.

Copies of the two Special Election Editions were distributed to 5,985 MCFL contributors and 50,674 non-contributors. MCFL also sent copies to local chapters, presumably for distribution to their members, and mailed copies to individuals who requested them. The FEC contends that

---

**1.** The newsletter was published three times in 1973, five times in 1974, eight times in 1975, eight times in 1976, five times in 1977, and four times in 1978.

the rest of the copies were left in public areas for general distribution.[2]

MCFL spent a total of $9,812.76 from its general treasury on the two publications. The FEC found probable cause to believe that MCFL violated 2 U.S.C. § 441b(a) by printing the flyers and distributing them to the general public. When conciliation proved unsuccessful, the FEC filed a complaint pursuant to 2 U.S.C. § 437g(a)(6)(A) (1982), seeking a civil penalty and such other relief as the court deemed appropriate.

The parties filed cross-motions for summary judgment, and the court granted summary judgment for MCFL, holding that the two publications did not fit within the meaning of "expenditure" as the term is used in 2 U.S.C. § 441b(b)(2) (1982). It also held that the publications were exempted from the prohibition against expenditures by 2 U.S.C. § 431(9)(B)(i) (1982), which exempts "any news story, commentary, or editorial distributed through the facilities of any ... newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate."

The court also concluded that if section 441b were applied to prohibit MCFL's expenditures in connection with the publication in question, the statute would be unconstitutional, violating the organization's rights of freedom of speech, press, and association.

## II.

Section 441b(a) provides in part:

§ 441b. Contributions or expenditures by national banks, corporations, or labor organizations.

(a) It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a *contribution or expenditure* in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office ...

(Emphasis added.) Section 441b(b)(2) provides that the term "contribution or expenditure" shall *include*

any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) *to any candidate*, campaign committee, or political party or organization, in connection with any election....

2 U.S.C. § 441b(b)(2) (emphasis added). This section refers to election expenditures by corporations, which the Act prohibits, except if such expenditures are made from separate segregated funds.

The general definitions section of the Federal Election Campaign Act contains a broader definition of expenditure which "includes"

any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person *for the purpose of influencing* any election for Federal office....

2 U.S.C. § 431(9)(A)(i) (1982) (emphasis added). This section would seem to apply to the entire Act, including the provisions relating to disclosure by political and campaign committees and to limitations on individual expenditures.

Before the district court and on appeal, the FEC contended that the broader definition set forth in section 431(9)(A)(i) should control in the instant case. Even if the section 441b definition only were to be applied, the FEC argues, the use of the word "include" indicates congressional intent that other activities besides payments to a candidate may be considered contributions

---

**2.** The FEC submitted an affidavit from Jean Weinberg, not a member of MCFL, who certified that she obtained a copy of the Special Election Edition at a statewide conference of the National Organization of Women. Weinberg averred that she obtained her copy from a stack of about 200 which were available to the general public. MCFL states that it made no copies of the Special Election Edition available to the general public.

or expenditures. The district court, however, concluded that the section 441b(b)(2) definition was intended to be exclusive, because in the court's view, the following provision amounted to an adoption in the general definition section solely of the section 441b(b)(2) definition:

(B) The term "expenditure" does not·include—

(v) any payment made or obligation incurred by a corporation or a labor organization which, under section 441b(b) of this title, would not constitute an expenditure by such corporation or labor organization.

2 U.S.C. § 431(9)(B)(v).

On appeal, the FEC contends that section 431 does not adopt the narrower section 441b definition and that the broader section 431 definition should apply to corporate expenditures.

The presence, of the word "include" in section 441b leaves open the possibility that "contribution or expenditure" could encompass more than payments *to* a candidate, campaign committee, or business organization.

A term whose statutory definition declares what it "includes" is more susceptible to extension of meaning by construction than where the definition declares what a term "means." It has been said "the word 'includes' is usually a term of enlargement, and not of limitation.... It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated . . .

2A N. Singer, *Sutherland Statutes and Statutory Construction* 133 (4th ed. 1984) (quoting *Argosy Ltd. v. Hennigan,* 404 F.2d 14, 20 (5th Cir.1968) ). *See Federal Land Bank of St. Paul v. Bismarck Lumber Co.,* 314 U.S. 95, 99–100, 62 S.Ct. 1, 3–4, 86 L.Ed. 65 (1941), *United States v. Mass. Bay Transportation Authority,* 614 F.2d 27, 28 (1st Cir.1980) ("Includes is not a finite word of limitation....").

The presence of section 431(9)(B)(v) alone does not indicate that section 441b(b)(2) should be read as though it contained the word "means" instead of "includes." Section 431(9)(B)(v) provides only that the definition of "expenditure" with regard to individual contributions shall be no broader than the definition with regard to corporate contributions. Therefore, the plain language of the statute suggests that "expenditure" in both contexts includes *but is not limited to* contributions *to* candidates, campaign committees, or political organizations.[3]

■ Ordinarily, the starting point in every case involving statutory construction is the statute itself, *Consumer Products Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), but where the statute is ambiguous, legislative history should be consulted. *See United States v. Donruss Co.,* 393 U.S. 297, 303, 89 S.Ct. 501, 504, 21 L.Ed.2d 495 (1969). Because the two statutory definitions of "expenditure" create some ambiguity, we turn to the legislative history for aid in determining the full scope of the definition of expenditure under section 441b.

2 U.S.C. § 441b originated in the Tillman Act, Pub.L. No. 59–36, 34 Stat. 864, 865 (1907), which prohibited all corporations from making money contributions "in connection with" elections. The statute was codified at 18 U.S.C. § 610 by the Federal Corrupt Practices Act, Pub.L. No. 68–506, § 302, 43 Stat. 1070, 1071 (1925) (prohibiting corporate expenditures and contributions of "anything of value" to federal candidates) and extended to unions by the War Labor Disputes Act, Pub.L. No. 78–89, § 9, 57 Stat. 163, 167 (1943). The statute as amended by the Taft-Hartley Act,

---

**3.** In *Reader's Digest Ass'n v. FEC,* 509 F.Supp. 1210, 1213 n. 2 (S.D.N.Y.1981), which involved distribution of video tapes by the Reader's Digest to other media outlets, the court noted that Reader's Digest maintained that "the expenditures in question are not prohibited by the statute, since they were not made to any 'candidate, campaign or political party or organization.'" The court added, "However, the statute also covers indirect payments." *Id.*

Pub.L. No. 80–101, § 304, 61 Stat. 136, 159 (1947), prohibited any corporation or labor organization from making "a contribution or expenditure *in connection with any election ...*" for federal office. *Id., quoted in United States v. UAW*, 352 U.S. 567, 568–69, 77 S.Ct. 529, 529–30, 1 L.Ed.2d 563 (1957) (emphasis added).

The legislative history of the Taft-Hartley Act includes the 1946 report of the House Special Committee to Investigate Campaign Expenditures, which stated:

> The intent and purpose of the provision of the act prohibiting any corporation or labor organization making any contribution in connection with any election would be wholly defeated if it were assumed that the term "making any contribution" related only to the donating of money directly to a candidate, and excluded the vast expenditures of money in the activities herein shown to be engaged in extensively. Of what avail would a law be to prohibit the contributing direct to a candidate and yet permit the expenditure of large sums in his behalf?

H.R.Rep. No. 2739, 79th Cong., 2d Sess. 36–37 (1947), *quoted in United States v. UAW*, 352 U.S. at 581, 77 S.Ct. at 536. The committee recommended that the statute

> be clarified so as to specifically provide that expenditures of money for salaries to organizers, purchase of radio time, and other expenditures by the prohibited organizations in connection with elections, constitute violations of the provisions of said section, whether or not said expenditures are with or without the knowledge or consent of the candidates.

*Id.* at 46 (italics omitted), *quoted in United States v. UAW*, 352 U.S. at 582, 77 S.Ct. at 536.

During congressional debate on the bill that was ultimately enacted, Senator Taft observed that the term "expenditure" would include any advertisement or newspaper published for political purposes by a union or corporation.

> [W]e have long prohibited corporations from contributing money for political purposes, and it was always supposed that the law prevented a corporation from operating newspapers for that purpose or advertising in newspapers for that purpose, until labor organizations were included ... and then it was said that the law prohibited contributions, but that political advertisements and political pamphlets could be published by the union or corporation itself.

> So what we are proposing to do is to subject labor organizations to exactly the same prohibition to which corporations have been subjected, and, so far as I know, including the things which I think the original law covered but regarding which doubt was raised by labor organizations.

93 Cong.Rec. 6436 (1947).

The following exchange clarifies Senator Taft's position:

> Mr. Pepper. ... Would the newspaper called Labor, which is published by the Railway Labor Executives, be permitted to put out a special edition of the paper, for example, in support of President Truman, if he should be the Democratic candidate for the presidency next year, and in opposition to the Senator from Ohio, if he should be the Republican nominee for the Presidency, stating that President Truman was a friend of labor and that Senator of Ohio was not friendly to labor? Would that be called a political expenditure on the part of the labor organization?

> Mr. Taft. If it were supported by union funds contributed by union members as union dues it would be a violation of the law, yes. It is exactly as if a railroad itself, using stockholders' funds, published such an advertisement in the newspaper supporting one candidate as against another. ... The prohibition is against a labor organization using its funds either as a contribution to a political campaign or as a direct expenditure of funds on its own behalf.

93 Cong.Rec. 6436–37 (1947).

The foregoing language of Senator Taft indicates his intent that a special election edition of a union or corporate newsletter

constitutes a prohibited expenditure under the Act. The Supreme Court provided a gloss to the congressional debate with its comment in *United States v. CIO*, 335 U.S. 106, 121, 68 S.Ct. 1349, 1356, 92 L.Ed. 1849 (1948), noting:

> If § 313 were construed to prohibit the publication, by corporations and unions in the regular course of conducting their affairs, of periodicals advising their members, stockholders or customers of danger or advantage to their interests from the adoption of measures, or the election to office of men espousing such measures, the gravest doubt would arise in our minds as to its constitutionality.

(Footnote omitted.) The Court held that the statute did not prohibit the publication of an edition of the weekly *CIO News* which was published with union funds, distributed only to union members or purchasers of the issue, and carried a statement by the CIO president urging all members to vote for a certain congressional candidate.

The Court concluded that "[a]pparently 'expenditure' was added to eradicate the doubt that had been raised as to the reach of 'contribution,' not to extend greatly the coverage of the section," *CIO*, 335 U.S. at 122, 68 S.Ct. at 1357 (footnote omitted), and stated that "[i]t would require explicit words in an act to convince us that Congress intended to bar a trade journal, a house organ, or a newspaper, published by a corporation, from expressing views on candidates ... in the regular course of its publication." *Id.* at 123, 68 S.Ct. at 1357.

In *United States v. UAW*, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957), the Supreme Court held that expenditure of union dues to sponsor political advertisements on commercial television violated the prohibition against corporate or labor organization expenditures in connection with an election for federal office. The Court examined extensively the legislative history of the Taft-Hartley Act, and concluded that Congress added the term "expenditure" to the statute precisely to embrace indirect campaign contributions such as union-sponsored political advertisements. *UAW*, 352

U.S. at 585, 77 S.Ct. at 538. The Court distinguished *CIO* on the ground that the CIO newspaper was distributed only to union members and newspaper purchasers, not to the general public. *United States v. UAW*, 352 U.S. at 589, 77 S.Ct. at 540. The evil at which Congress aimed, the Court observed, "is the use of corporation or union funds to influence the public at large to vote for a particular candidate or a particular party." *Id.*

■ In 1971, the Federal Election Campaign Act added the following language to the statute:

> As used in this section, the phrase "contribution or expenditure" shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) *to any candidate*, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section....

Pub.L. No. 92–225, § 205, 86 Stat. 3, 10 (emphasis added) and provided for the establishment of separate segregated funds to be used for political purposes. *Id.* Representative Hansen, who sponsored the bill, explained that

> The effect of this language is to carry out the basic intent of section 610, which is to prohibit the use of union or corporate funds for active electioneering directed at the general public on behalf of a candidate in a Federal election.

He added that

> The net effect of the amendment, therefore, is to tighten and clarify the provisions of section 610 of title 18, United States Code, and to codify the case law.

117 Cong.Rec. H43379 (1971). Nothing in Representative Hansen's remarks indicates that the change in language from "in connection with any federal election" to "to any candidate ... in connection with any

election" was meant to narrow the scope of section 610. *See Pipefitters Local Union 562 v. United States,* 407 U.S. 385, 410–411, 92 S.Ct. 2247, 2262–63, 33 L.Ed.2d 11 (1972).[4] In short, nothing in the legislative history suggests that Congress meant to narrow the prohibition of expenditures "in connection with" a federal election by the 1971 addition of the phrase "to any candidate." We conclude that section 441b prohibits expenditures in connection with federal elections as well as expenditures made to candidates for federal office. Therefore, we hold that the expenditure in the instant case is embraced by the section 441b definition of expenditure.

### III.

■ The district court opinion suggests that even if section 441b on its face were interpreted to preclude the expenditure in the instant case, the section 441b definition of expenditure should be read to incorporate the "express advocacy" requirement set forth in *Buckley v. Valeo,* 424 U.S. 1, 44, 96 S.Ct. 612, 646, 46 L.Ed.2d 659 (1972). The court concluded that the MCFL publications did not expressly advocate the election or defeat of any particular candidate, and therefore would not come within the scope of section 441b. We do not decide whether the section 441b definition of expenditure includes an "express advocacy" requirement, because we conclude, contrary to the district court, that the MCFL publication would fit within the definition of expenditure, even if an express advocacy requirement were incorporated into the definition.

The *Buckley* Court stated that "explicit words of advocacy of election or defeat of a candidate include 'vote for,' 'elect,' 'support,' 'Smith for Congress,' 'defeat,' 're-

ject,' etc." *Buckley,* 424 U.S. at 44, n. 52, 96 S.Ct. at 647, n. 52. The statement "Vote Pro-Life" does not fit within the *Buckley* definition of express advocacy because it does not advocate the election of particular candidates for particular offices, but urges support of a general position on a controversial issue. Compare the instant case with *FEC v. Central Long Island Tax Reform Immediately Committee,* 616 F.2d 45, 53 (2d Cir.1980). The MCFL Special Election Edition, however, explicitly advocated the election of particular candidates in the primary elections and presented photographs of those candidates only. It reminded the reader that "your vote in the primary will make the critical difference in electing pro-life candidates."[5] Thus, the Special Election Edition expressly advocated the election of clearly identified candidates within the meaning of *Buckley. Id.*

### IV.

■ The district court concluded that, even if the Special Edition amounted to express advocacy, it was exempt from § 441b because it constituted a periodical publication. 2 U.S.C. § 431(9)(B)(i) (1982) exempts from the reach of the statute "any news story, commentary, or editorial distributed through the facilities of any ... newspaper, magazine or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate."

The district court stated that the Special Election Editions were similar in newsprint, sheet form size and format to the MCFL Newsletter, which "typically filled 6–10 pages of newsprint and included explanations and endorsements of its opposition to abortion, reports of political developments

---

**4.** The statute was amended again in 1976, in response to *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1972). In *Buckley,* the Court construed the term "expenditure" as used in the individual expenditure limitation sections to mean express advocacy of the election or defeat of a particular candidate. 424 U.S. at 44, 96 S.Ct. at 646. This narrowing gloss was incorporated into the individual expenditure section of the statute in 1976 when the section prohibiting corporate and union expenditures was trans-

ferred from 18 U.S.C. § 610 to 2 U.S.C. § 441b by the Federal Election Campaign Act Amendments of 1976, Pub.L. No. 94–283, § 321, 90 Stat. 475, 490.

**5.** The disclaimer stating that "this special election edition does not represent an endorsement of any particular candidate" does not negate the expressions of advocacy in the publication.

and judicial rulings on abortion-related issues, announcements of social activities for members, and appeals for funds."

The court observed that the sparse legislative history of the exemption indicates that Congress intended the exemption to be interpreted broadly, coextensive with the First Amendment. Finally, the court noted that, according to the legislative history, the exemption was intended to codify existing law, presumably including dicta from *United States v. CIO*, 335 U.S. 106, 123, 68 S.Ct. 1349, 1357, 92 L.Ed. 1849 (1948), to the effect that "it would require explicit words in an act to convince us that Congress intended to bar a trade journal, a house organ, or a newspaper, published by a corporation, from expressing views on candidates or political proposals in the regular course of its publication."

We believe the Special Election Editions themselves do not constitute newspapers, magazines or periodical publications within the meaning of the statute. MCFL published these editions not periodically, but sporadically, and only during federal election campaigns. Moreover, at least 50,000 copies of the special editions were distributed at no cost to a large number of people; and the editions contained no printed volume or issue number nor any masthead designating them as newspapers or periodicals.[6]

Defendant argues, however, that the regular MCFL newsletter is a newspaper, magazine, or periodical publication, and that the Special Election Editions may be considered news stories, commentaries or editorials distributed through the newsletter's facilities. However, even assuming that the regular MCFL newsletters may be considered periodical publications, this argument must fail. The circulation of the Special Election Editions constituted approximately *twenty times* that of any edition of the regular newsletter. The Special

Editions did not carry the masthead of the MCFL Newsletter; nor did they contain a printed volume and issue number. Although they bore some physical resemblance to the regular newsletters, nothing in the editions informed the reader that the editions were at all related to the MCFL newsletters. In fact, the editions were published by a staff that produced no previous or subsequent newsletters. Under the circumstances, the Special Editions may not be considered news stories, commentaries, or editorials because the editions were not distributed through the newsletter's facilities, were not published by the newsletter staff, did not contain the newsletter masthead, and were not limited to the usual MCFL newsletter circulation.

Neither may the publication of the Special Editions be considered one of the "normal functions of a press entity." *FEC v. Phillips Publishing Co.*, 517 F.Supp. 1308, 1313 (D.D.C.1981). In *Phillips Publishing*, the court held that printing and distributing a letter soliciting subscriptions was a normal, legitimate press function and therefore was covered by the press exemption. Similarly, in *Reader's Digest Association v. FEC*, 509 F.Supp. 1210 (S.D.N.Y.1981), the court concluded that dissemination of a tape for the purposes of publicizing the magazine would fall within the press entity's legitimate function, and would be covered by the exemption. It is arguable that under certain circumstances publication of a special edition may be described as a normal function of a press entity. However, we do not consider distribution of a special edition at no cost to twenty times the customary circulation of the newspaper to be one of a newspaper's normal, legitimate functions—especially when the special edition does not carry the newspaper's masthead. We therefore hold that the Special Election Editions are not exempted from the reach of

---

6. It is undisputed that MCFL printed 100,000 copies of the 1978 Special Election Edition and 20,000 copies of the Complimentary Partial Election Edition. In its answers to interrogatories, MCFL stated it had 5,633 "contributing and dues-paying members" in 1976, 5,148 in 1977,

and 5,985 in 1978. During this period it published a total of seventeen newsletters. Apparently, only the election editions, published in 1976 and 1978, were distributed to persons who did not contribute financially to the organization.

section 441b by the press exemption set forth in section 431(9)(B)(i).

### V.

■ Because we conclude that the Special Election Edition falls within the ambit of section 441b, we turn to the question whether section 441b as applied to the Special Election Edition passes constitutional muster. The district court concluded that "if § 441b were intended by Congress to prohibit MCFL's expenditures of printing and distributing the newsletters in question, it would be ... violative of MCFL's freedoms of speech, press, and association."

The FEC argues that section 441b as applied to the Special Election Edition did not affect MCFL's First Amendment rights, and that the government has a substantial interest in enforcing the statute.

The starting point of our analysis must be a classification of section 441b as a content-based restriction or a regulation of the time, place, or manner of expression. In the instant case, the statute prohibits the use of corporate funds to publish newsletters "in connection with" federal elections. The FEC has no quarrel with the time, place, or manner of expression of the MCFL Special Editions; it is the political *content* of the publications which runs afoul of the statute. Therefore, section 441b must be considered a content-based restriction of expression, and may be justified only by a showing of substantial government interest. *See Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

The FEC argues that section 441b does not affect MCFL's First Amendment rights because the Act does not absolutely prohibit corporations from engaging in political advocacy. Under the statute, MCFL would be permitted to use its corporate funds to establish a voluntary, segregated fund to be used for political purposes. 2 U.S.C. § 441b(b)(2)(C) (1982). Had the Special Election Edition been produced with money from such a fund, the FEC argues, MCFL's freedom to engage in political advocacy would have been preserved. It does not appear to this court, however, that the availability of alternative methods of funding speech justifies eliminating the simplest method. *Cf. Linmark Associates v. Willingboro*, 431 U.S. 85, 93–94, 97 S.Ct. 1614, 1618–19, 52 L.Ed.2d 155 (1977); *Spence v. Washington*, 418 U.S. 405, 411 n. 4, 94 S.Ct. 2727, 2731 n. 4, 41 L.Ed.2d 842 (1974).[7]

The FEC contends that the regulation in the instant case is permissible because it is necessary to protect substantial government interests. The purposes of section 441b were set forth in *FEC v. National Right to Work Committee*, 459 U.S. 197, 207–08, 103 S.Ct. 552, 559–60, 74 L.Ed.2d 364 (1982):

> to ensure that substantial aggregations of wealth amassed by the substantial advantages which go with the corporate form of organization should be converted into political "war chests" which could be used to incur political debts from legislators who are aided by the contributions.... The second purpose ... is to protect the individuals who have paid money into a corporation or union for purposes other than the support of candidates from having that money used to supprt political candidates to whom they may be opposed. (Citations omitted.)

The Court emphasized that:

> the overriding concern behind the enactment of statutes such as the Federal

---

7. Moreover, establishment of a voluntary, segregated fund (political committee) requires disclosure of the names of contributors. 2 U.S.C. § 432 (1982). Under certain circumstances, this requirement may deter political activity on the part of individuals and may chill political speech on the part of the corporation. *See Buckley v. Valeo*, 424 U.S. at 74, 96 S.Ct. at 661; *FEC v. Hall-Tyner Election Campaign Committee*, 678 F.2d 416, 423 (2d Cir.1982) (campaign disclosure provisions endanger First Amendment rights if an organization demonstrates a pattern of threats or the existence of specific manifestations of public hostility against the organization or its members). In addition, amicus curiae the Civil Liberties Union of Massachusetts (CLUM) contends that many issue-centered organizations would be prohibited by their own by-laws from registering as political committees because of a commitment to the principle of non-partisanship. Brief of CLUM at 21.

Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. The importance of the governmental interest in preventing this occurrence has never been doubted. Likewise, in *Buckley v. Valeo* [424 U.S.] at 26–27 [96 S.Ct. at 638–39], we specifically affirmed the importance of preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption. These interests directly implicate "the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process."

*Id.* at 208, 103 S.Ct. at 559 (additional citations omitted).

In the instant case, we must observe that the foregoing government interests do not seem to be substantially implicated by MCFL's expenditures. Because MCFL did not contribute directly to a political campaign, MCFL's expenditures did not incur any political debts from legislators. Moreover, contributors to MCFL need not be protected from having their money used for expenditures such as the Special Election Edition. Individuals who contribute to MCFL do so because they support MCFL's anti-abortion position and presumably would favor expenditures for a publication that informs contributors and others of the position of various candidates on the abortion issue. That would appear to be the very purpose of the organization and the contributions to it.

The FEC contends that the instant case is controlled by *National Right to Work Committee,* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364. In that case, the Supreme Court upheld the prohibition of the use of corporate funds to distribute a letter soliciting contributions for the corporation's political action fund which, in turn, contributed directly to candidates. However, the instant case, unlike *National Right to Work Committee,* involves a corporation's indirect and uncoordinated expenditures in con-

nection with a federal election, not a solicitation for direct contributions to candidates. *See Federal Election Commission v. National Conservative Political Action Committee,* — U.S. —, —, 105 S.Ct. 1459, 1467, 84 L.Ed.2d 455 (1985). ("NRWC is consistent with this Court's earlier holding that a corporation's expenditures to propagate its views on issues of general public interest are of a different constitutional stature than corporate contributions to candidates.") The government has less interest in regulating independent expenditures than in regulating direct campaign contributions. As the Supreme Court stated in *Buckley:*

> The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.

*Buckley v. Valeo,* 424 U.S. at 47, 96 S.Ct. at 648.

We must conclude that the FEC has offered no substantial government interest in prohibiting MCFL's expenditures for publication of its Special Election Editions. We therefore hold that the application of section 441b to indirect, uncoordinated expenditures by a non-profit ideological corporation expressing its views of political candidates violates the organization's First Amendment rights. On that basis, we affirm the judgment of the district court.