**COUNTY OF SENECA, Save Our Seneca, Keep Our Base in Romulus Alive, American Federation of Government Employees Local 2546, and Seneca County Industrial Development Agency, Plaintiffs,**

v.

**Richard CHENEY, as the Secretary of Defense, Michael Stone, as the Secretary of the Army, and Susan Livingstone, Assistant Secretary of the Army, Defendants.**

**No. 92–CV–6380L.**

United States District Court, W.D. New York.

Nov. 9, 1992.

Edward F. Premo, II, Harter, Secrest & Emery, Rochester, N.Y., for plaintiffs.

Susan Korytkowski, U.S. Dept. of Justice, Civ. Div., Washington, D.C., Brian McCarthy, Asst. U.S. Atty., Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

Agencies of the Government—just like ordinary citizens—must comply with the law regardless of whether it is inconvenient or burdensome to do so. Because I believe that the Secretary of the Army and the Secretary of Defense acted contrary to a statute recently passed by Congress governing the closure or realignment of military installations, I hereby issue an injunction in order to guarantee compliance with the law.

This is an action for declaratory and injunctive relief involving claims under the Defense Base Closure and Realignment Act of 1990 ("BRAC"), Pub.L. 101–510, 104 Stat. 1808, the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 & 706(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs [1] seek to enjoin the Sec-

---

**1.** Plaintiffs are: the County of Seneca, a political subdivision of the State of New York, and its Board of Supervisors; Save Our Seneca ("SOS"), an unincorporated association of individuals and businesses in Seneca County; Keep Our Base in Romulus Alive ("KOBRA"), an unincorporated association of concerned citizens and civilian employees working at SEAD; American

retary of Defense and the Secretary of the Army (sometimes collectively "the Secretary") from taking any actions in connection with the elimination and reduction of missions or functions at the Seneca Army Depot ("SEAD" or "the base") in Romulus, New York that would result in the elimination of hundreds of civilian positions at the base.

This action was precipitated by the Secretary's decision to change the nature of the work performed at SEAD. This change by any analysis is a major one which would eliminate approximately 70 percent of the authorized civilian positions at the base. Plaintiffs seek to enjoin this unilateral action by the Secretary on the grounds that the defendants acted in violation of BRAC and NEPA. In essence, plaintiffs claim that the Secretary is "realigning" SEAD without complying with the rigid procedures established by Congress in BRAC for the closure or realignment of military installations.

Defendants oppose this action on the grounds that their actions are not subject to judicial review, and, alternatively, that BRAC and NEPA do not apply to the actions occurring at SEAD. Pending before me now is plaintiffs' motion for preliminary injunctive relief under Fed.R.Civ.P. 65.

For the reasons discussed below, plaintiffs' motion is granted and a preliminary injunction will issue to bar the Army and the Department of Defense from carrying out the reductions at SEAD.

## HISTORY OF SEAD

SEAD, which was built in 1941 and known originally as the Seneca Ordnance Depot, is an Army depot under the command of the Depot System Command ("DESCOM"), one of the subordinate commands of the Army Material Command ("AMC"). DESCOM is responsible for all the Army depots in the United States and abroad, and AMC is the major Army command responsible for the research, development, acquisition, and logistics for Army material. Historically, SEAD has had two primary missions or functions relating to: (1) special weapons; and (2) the rehabilitation of industrial plant equipment ("IPE"). The special weapons mission required SEAD to store, issue, maintain, and supply special weapons, such as ground-launched nuclear missiles and nuclear artillery shells,[2] and conventional munitions, including bullets, bombs, and shells. There are 442 civilian and 387 military personnel positions associated with this mission. The IPE rehabilitation mission required SEAD to maintain and store industrial equipment, which consists, generally, of large machine tools used by the Department of Defense ("DOD") industrial organizations and contractors, including depots, arsenals and ammunition plants. There are 143 civilian personnel positions associated with this mission. In addition, the 833d Ordnance Company, a munitions maintenance unit, was a tenant organization stationed at SEAD.

Between 1990 and 1991, the DOD and the Army made several decisions that were intended to restructure SEAD. First, in 1990, the DOD planned a gradual reduction in its special weapons that was to start in 1991 and end in 1998. In March 1991, DOD determined the number of special weapons that it wanted to retain. Based on this determination, the Army concluded that its depot system's special weapons missions should be reduced accordingly. AMC therefore ordered DESCOM to design a plan to consolidate the Army's special weapons mission at a single site. The report submitted by DESCOM recommended the consolidation and storage of special weapons at a depot other than SEAD.

Next, on July 25, 1991, Assistant Secretary of Defense Colin McMillan issued a memorandum ordering that all depot IPE

Federation of Government Employees Local 2546 ("Local 2546"), the labor union for non-managerial civilian employees at SEAD; and Seneca County Industrial Development Agency, a public benefit corporation.

**2.** Although the Department of Defense neither confirms nor denies the existence of special weapons at any military installation, it acknowledges that SEAD has special weapons "capability."

maintenance functions be consolidated in Defense Logistics Agency ("DLA") facilities. SEAD was not such a facility. DLA was scheduled to take the lead in coordinating with the Army the transfer of all IPE depot maintenance workloads to DLA facilities. The consolidation of IPE maintenance was expected to result in the elimination of 122 civilian positions at SEAD by October 1, 1992.

Finally, the 833d Ordnance Company was scheduled to be inactivated on September 14, 1992. The inactivation was expected to result in the loss of approximately 75 military positions at SEAD.

In light of the proposed actions, on August 27, 1991, AMC directed DESCOM to conduct a study under Army Regulation ("AR") 5–10, which specified the procedures that had to be followed and the documentation that would be required before the Army reduced its civilian employment by 50 persons or 10%, whichever was less. The study's focus was on the DESCOM missions and workloads that would be affected by a reduced special weapons mission, a consolidation of IPE rehabilitation work, and the inactivation of the 833d Ordnance Company. A study team was subsequently organized to begin collecting data.

Not long after the study began, however, President George Bush made a significant announcement concerning this country's use of nuclear weapons. This announcement, which reflected historic international agreements with the Soviet Union, would have significant impact on this country's arsenal of nuclear weapons. President Bush announced "a series of sweeping initiatives affecting every aspect of our nuclear forces on land, on ships, and on aircraft." Defendants' Memorandum in Opposition to Plaintiffs' Motion ("Defendants' Mem.") at 13 (quoting Address to the Nation on Reducing U.S. and Soviet Nuclear Weapons (Weekly Comp.Pres.Doc.) 1346, 1349 (Sept. 27, 1991)). As part of these initiatives President Bush directed that "the United States eliminate its entire worldwide inventory of ground-launched ... nuclear weapons." *Id.* (alterations in original).

Following President Bush's announcement, defendant Richard Cheney, the Secretary of Defense, in a memorandum dated September 28, 1991, directed the Secretaries of the Military Departments, Chairman of the Joint Chiefs of Staff, Undersecretaries of Defense and Assistant Secretary of Defense for Command, Control Communications and Intelligence to implement the President's decision. The memorandum ordered that the following actions be completed as soon as possible:

1. The United States armed forces shall eliminate its inventory of ground-launched theater nuclear weapons.

2. Tactical nuclear weapons shall be removed from all surface ships, attack submarines, and land-based naval aircraft bases.

3. United States strategic bombers shall stand down from their alert postures and their nuclear weapons shall be removed and stored in secure areas.

4. The United States intercontinental ballistic missiles scheduled for deactivation under the terms of the Strategic Arms Reduction Treaty shall stand down from alert.

5. Development of the mobile Peacekeeper ICBM rail garrison system and the mobile portions of the small ICBM program shall be terminated.

6. The nuclear short-range attack missile program (SRAM–II) shall be terminated.

7. A unified Command Plan with a United States Strategic Command to which all elements of the U.S. strategic deterrent are to be assigned shall be submitted to [the Secretary].

Declaration of Robert O. Frantz, Ex. A.

As a result of the President's announcement and the Secretary's implementing directives, the prior decisions concerning the realignment of SEAD's special weapons mission were scrapped. It was then determined, according to defendants, that rather than "realign" the special weapons mission, the mission or function was to be eliminated completely. Consequently, AMC ordered DESCOM to change the focus of the

AR 5–10 study that had been ordered earlier to account for this change concerning the special weapons mission at SEAD.

DESCOM's study team submitted a preliminary AR 5–10 report on October 31, 1991. According to defendants, AMC found that the report was not properly conducted according to Army regulations. Consequently, AMC compiled additional information and performed further analysis to ensure that the final report conformed to all AR 5–10 requirements.

Defendants claim that as part of this analysis, AMC's Base Realignment and Closure Office analyzed whether BRAC procedures had to be followed. The decision was that BRAC did not apply to the proposed actions for SEAD. AMC subsequently completed the AR 5–10 report and submitted it to the Army on December 16, 1991.

The Army reviewed the final report and performed additional analysis. It concurred in the report's findings and recommendations. In addition, according to defendants, Congressman Frank Horton of New York requested that the General Accounting Office ("GAO") review the Army's proposals concerning SEAD before a final decision was made. The GAO reviewed the proposal and, allegedly, concurred with it.

On July 2, 1992, the Secretary of the Army approved the recommendations which changed the functions and missions of the base, with the resulting immediate termination of approximately 560 civilian employees. The Army's plan included the elimination of the special weapons mission at SEAD and a large-scale reduction and relocation of the IPE rehabilitation function. The elimination of the special weapons mission resulted in the elimination of 442 civilian and 387 military positions at SEAD. In addition, SEAD was scheduled to be downgraded from a "depot" to a "depot activity." According to plaintiffs, as a result of this downsizing, the number

of civilian personnel authorized at SEAD will drop from 847 to 285—a reduction of nearly 70 percent—and the number of military employees will drop from 487 to 3.

Also on July 2, 1992, defendant Susan Livingstone, an Assistant Secretary of the Army, briefed a delegation of New York Congressmen on the AR 5–10 study and the Army's plans to eliminate civilian positions at SEAD. The Army also advised SEAD civilian employees of their rights under reduction-in-force ("RIF") procedures, and it notified those employees who would be adversely affected by the RIFs of their entitlement to participate in the Priority Placement Program ("PPP"),[3] and voluntary assistance programs. In addition, the Army obtained approval to allow early retirements under the Voluntary Early Retirement Authority ("VERA"), and communities affected by a RIF would be allowed to participate in a number of assistance programs sponsored by the federal government.

According to defendants, as of June 30, 1992, the movement of all special weapons from Europe was complete, and as of July 30, 1992, the special weapons storage mission of SEAD was eliminated. The Army is currently in the process of phasing out military positions associated with SEAD's special weapons mission.

## PROCEDURAL HISTORY

Plaintiffs commenced this action and moved for a preliminary injunction by an Order to Show Cause on September 9, 1992. Oral argument on plaintiffs' motion was held on October 1, 1992. Then, on October 6, 1992, President Bush signed into law the 1993 Defense Appropriations Act ("Appropriations Act"). Pub.L. No. 102–396 (1992). The Senate Report that accompanied the Appropriations Act, S.Rep. No. 408, 102d Cong., 2d Sess. 40 (1992), contained the following language concerning the Army's actions at Seneca:

---

**3.** PPP, which is triggered when a RIF is initiated, is a program designed to give displaced DOD employees the opportunity to secure employment at other DOD facilities. Under the PPP, however, if an employee is given a job offer at another facility, he or she must answer within 72 hours, and if the offer is declined, the employee could lose certain benefits, depending on whether the offer was for a local facility or a distant facility.

The committee is concerned by the piece-by-piece dismantlement of Seneca Army Depot. Therefore, the Committee prohibits the use of any DOD funds to plan for, or implement, the transfer, realignment, alteration, or downsizing of any mission or activity at Seneca Army Depot except as part of the base realignment and closure process.

The joint Conference Report, however, did not contain any language about SEAD, nor did the Appropriations Act itself. The parties were directed to brief the issue as to whether the language in the Senate Report had any effect on the pending litigation.

On October 9, 1992, apparently in response to the language in the Senate Report, defendant Michael Stone, Secretary of the Army, issued a press release declaring that the civilian reductions-in-force scheduled to be effective at SEAD on November 13, 1992 instead would be effective no earlier than February 11, 1993.[4] The Court held argument after issuance of the press release to clarify its ramifications.

Defendants' counsel confirmed that the RIF would be postponed to a date no earlier than February 11, 1993, and that the time within which to select early retirement would be similarly postponed, although no exact date for selection was set. Defendants also asserted that participation in the PPP could not be postponed or deadlines extended for those who elected to participate because the program was in effect nationwide and employees at SEAD could not be given a preference.

### DISCUSSION

#### 1. *Contentions of the Parties.*

Plaintiffs claim in this action that defendants cannot reduce the civilian work force at SEAD on such a large scale without following the process and procedures established by BRAC.

Plaintiffs also contend that even if defendants were not bound by BRAC, their actions were still improper because they failed to comply with the requirements of NEPA. Specifically, plaintiffs contend that defendants were required to assess and study the impact their actions would have on the human environment and were obligated to mitigate such impact.

Defendants, in response, contend that their actions are not subject to judicial review. Specifically, defendants contend that their decision that the provisions of BRAC do not apply, and the decisions taken as a result of that are not subject to judicial review because such review would unduly interfere with the duties and responsibilities of the President as Commander–In–Chief. Therefore, the defendants argue, this action presents a nonjusticiable political question. Defendants further contend that Congress intended to preclude judicial review in the circumstances that exist here.

On the merits, defendants contend that their determination that BRAC does not apply is clearly correct because the reductions do not fit within the statutory requirements or are exempt under BRAC's provisions.

Therefore, defendants contend that plaintiffs have failed to satisfy the requirements for obtaining a preliminary injunction.

#### 2. *History of the Base Closure and Realignment Process.*

In 1990, in response to the need for a fair and timely process for closing and realigning military installations, Congress enacted BRAC. BRAC is the latest in a series of congressional attempts to regulate the complete or partial closure of military installations. It is the interpretation of

---

**4.** The press release also noted that the extension will provide additional time to discuss the continuing use of SEAD and the availability of DOD and other federal assistance programs. Finally, the press release noted that the Army intended to explore all possible options for backfill potential at SEAD to replace those missions lost during the past year.

Late on Friday, November 6, 1992, defendants notified the Court that the RIF is now scheduled to take place on March 12, 1993. No VERA deadline has been established, although, the Army is in the process of obtaining a firm date.

BRAC that is at the heart of the dispute between the parties.

Congress's first legislative attempt to permanently regulate the process occurred in 1977, when it enacted 10 U.S.C. § 2687. At that time, section 2687 prohibited the Secretary of Defense from closing or realigning any military installation, unless he first: (1) notified the Senate and House Armed Services Committees of the installations selected for closure or realignment; and (2) submitted to those committees an evaluation of the consequences of the closure or realignment. The Secretary had to wait at least 60 days before taking action on the closures, during which time Congress could act to prevent the closure or realignment. Congress enacted this provision, in part, because many Congressmen had come to believe that the Executive branch was using its base-closure power to punish uncooperative legislators. *See* 1991 Defense Base Closure and Realignment Commission Report to the President (hereinafter "1991 Commission Report") at 1–1. Under the 1977 version of section 2687, however, no bases were closed for the next eleven years.

Because of the deadlock created by section 2687, Congress, in 1988, enacted the Defense Authorization Amendments and Base Closure and Realignment Act of 1988, Pub.L. 100–526, 102 Stat. 2623 (1988) (the "1988 Act"), the immediate predecessor to BRAC. Under the 1988 Act, the Secretary of Defense no longer had the power to unilaterally choose which bases to close or realign. Instead, that power was vested in an independent commission that was to recommend bases for closure and realignment, and present those recommendations to the Secretary to either accept or reject the entire list of bases selected. If the Secretary approved the recommendations, Congress had 45 days within which to overrule the Secretary and reject the base closure recommendations.

The 1988 Act, however, did not establish a permanent process for closing or realigning military installations. Rather, it created a one-time exception to the process created in 1977 by section 2687.

In 1990, the Secretary of Defense proposed another round of closures. The Secretary's recommendations, however, raised some suspicions in Congress "about the integrity of the base closure selection process." H.R.Conf.Rep. No. 923, 101st Cong., 2d Sess. 705, *reprinted in* 1990 U.S.C.C.A.N. 2931, 3110, 3257. In fact, the House Report went so far as to note that "Secretary Cheney's announcement of candidates for base closure on January 29, 1990, was an example of the wrong way to close bases." H.Rep. No. 665, 101st Cong, 2d Sess. 341–42, *reprinted in* 1990 U.S.C.C.A.N. 2931, 3067.

As a result, Congress enacted BRAC in 1990. Its stated purpose was "to provide a fair process that will result in the timely closure and realignment of military installations in the United States." *BRAC* § 2901(b). Under BRAC, there are scheduled to be three rounds of base closures and realignments, commencing in the years 1991, 1993, and 1995.

The procedure for closure and realignment are similar to the procedures created in the 1988 Act. An independent commission is required to convene in the years scheduled for base closures, and it is to review a list of installations that the Secretary has recommended for closure or realignment. In addition, the Secretary is required to submit to Congress and the Commission, for the fiscal years 1992, 1994, and 1996, a six-year force structure plan based on the assessment of probable threats to national security. § 2903(a). The Secretary is also required to publish in the Federal Register, for public notice and comment, criteria to be used by DOD in making its recommendations for base closure or realignment. § 2903(b).

Once the Commission receives the recommendations of the Secretary, it is required to conduct public hearings. § 2903(d)(1). The Commission can deviate from the recommendations of the Secretary if the Secretary's proposal deviates from the force structure plan, and the Secretary's final criteria. § 2903(d)(2)(B). The Commission must then transmit its recommendations, along with a report explaining the recom-

mendations that differ from those proposed by the Secretary, to the President for his review. §§ 2903(d)(2)(A) & (d)(3).

The President must then transmit to the Commission his report either accepting or rejecting, in whole or in part, the Commission's recommendations. § 2903(e)(1). If the President approves the Commission's recommendations, he must also transmit to Congress a copy of the recommendations. § 2903(e)(2). If the President disapproves the recommendations, the Commission must then submit a revised recommendation to the President for his consideration. § 2903(e)(3).

If the President approves the revised list, he must transmit a copy of the revised recommendations to Congress. § 2903(e)(4). If the President fails to send his list of recommended base closures to Congress by September 1 of any year in which the Commission sent him recommendations for closure, the base closure process for that year is terminated and no bases may be closed. § 2903(e)(5).

Also, the Secretary may not carry out any closure or realignment recommended by the Commission if Congress enacts, within 45 days after the President transmitted the recommendations to it, a joint resolution disapproving such recommendations. § 2904(b).

BRAC, like the 1988 Act, contains a provision exempting the participants in the BRAC process from the requirements of NEPA. BRAC provides that:

"The provisions of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) shall not apply to the actions of the President, the Commission, and except as provided in paragraph (2), the Department of Defense in carrying out this part."

§ 2905(c)(1). The exception referenced in the above section provides that:

The provisions of the National Environmental Policy Act of 1969 shall apply to actions of the [DOD] under this part (i) during the process of property disposal,

and (ii) during the process of relocating functions from military installation being closed or realigned to another military installation after the receiving installation has been selected but before the functions are relocated.

§ 2905(c)(2)(A).

The base closure and realignment process under BRAC for 1991 began in April, 1991, when the Secretary submitted to the Commission his list of military installations that he recommended should be closed or realigned. SEAD was not one of the installations on the Secretary's list. After the Secretary's recommendations were reviewed by the Commission, it transmitted its list of bases recommended for closure or realignment to President Bush, who approved all the recommendations. SEAD was not included in this list either. A proposal to disapprove the Commission's recommendations was defeated in Congress. Consequently, the Secretary was then authorized to commence closing and realigning the installations recommended by the Commission.

### 3. Justiciability.

■ The threshold issue in this action is one of justiciability.[5] Defendants contend that this Court lacks authority to review their actions. They contend that the matters in dispute relate to the conduct of foreign and military affairs and are, therefore, not reviewable by the judiciary since those functions are peculiarly within the province of the Executive branch. Defendants suggest that plaintiffs' remedy, if any, lies in either the Legislative or Executive branch of Government and that plaintiffs should seek redress there rather than through the judicial process. Implicit in this argument is defendants' reliance on the so-called political question doctrine.

I am not persuaded by defendants' contentions that this Court lacks jurisdiction to determine the dispute between these parties. The dispute essentially involves an

---

5. Because the defendants do not dispute that plaintiff Local 2546 has standing, I need not address the question of standing on this motion.

*National Fed'n of Fed. Employees v. U.S.,* 905 F.2d 400, 403 n. 4 (D.C.Cir.1990).

interpretation of an act of Congress. There may well be certain decisions made by the President and the independent Commission that are not subject to judicial review, but the decision at issue here, that is, the Secretary's unilateral decision that BRAC did not apply, is certainly subject to judicial review.

It is certainly true, as defendants argue, that "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Department of Navy v. Egan*, 484 U.S. 518, 530, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988). Issues bearing directly on our national security and foreign policy have long been recognized as within the "province and responsibility of the Executive." *Id.* at 529, 108 S.Ct. at 825 (quoting *Haig v. Agee*, 453 U.S. 280, 293–94, 101 S.Ct. 2766, 2775, 69 L.Ed.2d 640 (1981)).

This deference to the Executive in his role as Commander-in-Chief of the Armed Forces, and to a lesser extent to Congress with its "power of the purse," is premised on the recognition that judgment-calls or policy decisions on issues relating to national security or foreign policy are best left to those with expertise in the area and to the "branches of government which are periodically subject to electoral accountability." *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973). *See also Laird v. Tatum*, 408 U.S. 1, 14–5, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). "The Judiciary," the Supreme Court has noted, "is particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'" *Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C.Cir.1981) (footnote omitted), *cert. denied*, 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982)).

But certainly not every matter concerning the military or touching on politics requires the judiciary to stay its hand. *Japan Whaling*, 478 U.S. at 230, 106 S.Ct. at 2866. Although executive decisions relating to foreign relations are generally not subject to judicial review, "[i]t is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962)). Similarly, "[t]he fact that one facet of a decisionmaking process involves an exercise of discretion concerning military affairs does not insulate all aspects of that process from judicial review." *Specter v. Garrett*, 971 F.2d 936, 954 (3d Cir.1992), *petition for cert. filed*, 61 U.S.L.W. 3266 (Sept. 17, 1992) (No. 92–485). *See also Falk v. Secretary of the Army*, 870 F.2d 941, 944 (2d Cir.1989) (noting that it is now agreed that the judiciary has jurisdiction to decide whether the Secretary of the Army exceeded or disregarded the powers Congress has delegated to him).

Furthermore, it has long been recognized that "when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history ... that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied." *Laird*, 408 U.S. at 15–6, 92 S.Ct. at 2327. Indeed, the power of the Judiciary to review activities of the military that are alleged to be in direct violation of the law exists even if the military believes it was acting lawfully in times of war. *See Duncan v. Kahanamoku*, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946) (Habeas corpus petition granted in favor of civilian petitioners imprisoned pursuant to military trials held during period of martial law, in the then Territory of Hawaii, following attack on Pearl Harbor because the military exceeded its authority by closing the civil courts), and *Gilligan*, 413 U.S. at 12, 93 S.Ct. at 2446. The mere fact that the Executive is acting in his capacity as Commander-in-Chief, without more, is an insufficient basis to bar review of a claim that the actions were unlawful. *See Youngstown*

*Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (upholding injunction against President Truman's seizure of the nation's steel mills).

When the issues presented by an action involve interpreting congressional legislation and protecting rights believed to have been infringed by an administrative agency's failure to comply with that legislation, the Judiciary is empowered to review the controversy. *See* 5 U.S.C. § 702.

Indeed, in a matter such as the one involving SEAD, which revolves essentially around issues of statutory interpretation, the controversy is especially appropriate for review, for "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." *Japan Whaling*, 478 U.S. at 230, 106 S.Ct. at 2866. The Judiciary's role is not curtailed simply because the statute in question touches on matters traditionally regarded as belonging in the province of the Executive. Once Congress, acting within the bounds of its constitutional authority, enacts legislation that prescribes or prohibits certain conduct on the part of an administrative agency, it is within the power of the Judiciary, under the right of review granted under the APA, to address whether the agency has complied with the requirements established by Congress.

In *Japan Whaling*, the Supreme Court squarely addressed this issue. There, the Court was confronted with the question whether under the Pelly and Packwood Amendments, the Secretary of Commerce was required to certify that Japan's whaling practices diminished the effectiveness of the International Convention for the Regulation of Whaling because Japan's annual harvest exceeded the quotas established under the Convention. Petitioners, the Japan Whaling Association, challenged the Court's authority to even address the question, on the ground that the issue was a nonjusticiable political question. The Supreme Court rejected petitioners argument noting that, "under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Japan Whaling*, 478 U.S. at 230, 106 S.Ct. at 2866.

In the context of BRAC, the issue of justiciability was discussed at length by the Third Circuit in *Specter v. Garrett*, 971 F.2d at 953, a decision relating to the closure of the Philadelphia Naval Shipyard. Plaintiffs in that case claimed, in part, that the Government failed to follow proper procedures under BRAC in arriving at the decision to close the installation. Defendants, a group that included the Secretary of the Navy and the Secretary of Defense, argued that the court was barred from reviewing the matter because the plaintiffs' claims were nonjusticiable political questions.

The Third Circuit, relying on *Japan Whaling*, disagreed, noting that "while it is not the role of the courts to disturb policy decisions of the political branches, the question of whether an agency has acted in accordance with a statute is appropriate for judicial review." *Specter*, 971 F.2d at 954.

The issues raised here, like those in *Specter*, concern whether or not the Department of Defense and the Department of the Army have acted in accordance with BRAC. Plaintiffs contend that defendants were required to go through the base closure and realignment process established by BRAC before implementing the reductions at SEAD. Defendants, in response, contend that BRAC does not apply because of the nature of the reductions and because of the changes in functions at SEAD. In defendants' view, because the so-called special weapons function has been eliminated pursuant to President Bush's directive, BRAC's procedures do not apply. Thus, at bottom, this action calls upon the court to engage in the quintessential judicial function of statutory interpretation; namely, whether BRAC applies to the defendants' actions, and, if so, whether defendants have acted in violation of the Act. As was the case in both *Japan Whaling* and *Specter*, the issues raised by this case are appropriate for judicial review.

*4. Judicial Review Under the APA.*

■ I turn next to defendants' contention that this court lacks the authority to hear this action because Congress intended to preclude all judicial review under BRAC. Defendants contend that Congress's intent to preclude review is demonstrated not only by the legislative history of the Act, but also by the Act's objectives and the structure of the statutory scheme it created. Defendants focus, in particular, on the fact that BRAC represents a delicate compromise between the Executive and Legislative branches. They contend that this "balance" would be upset if the Judiciary were allowed to intervene.

I disagree. Judicial review under the APA was intended to address precisely the type of alleged non-compliance with specific statutory provisions which plaintiffs argue exist here, *see Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 675–77, 106 S.Ct. 2133, 2138–39, 90 L.Ed.2d 623 (1986) (attack on validity of administrative regulation was reviewable), and defendants have not overcome the presumption of judicial review created by the APA.

Not only have defendants failed to point to any expressed intent by Congress in BRAC or its legislative history to bar review of the type of claims brought here, but the statutory scheme created by BRAC weighs in favor of, and not against, allowing judicial review. If the Department of Defense were allowed to circumvent the base closure and realignment process simply by asserting that its actions do not fall under BRAC, the Act would be rendered meaningless, and the balance between the Legislative and Executive branches would be destroyed.

I find that the APA does apply to this action. First, the actions of the Secretary of Defense and the Secretary of the Army constitute the actions of their respective agencies. *See Japan Whaling*, 478 U.S. at 230 n. 4, 106 S.Ct. at 2866 n. 4. In addition, because defendants have already begun the process of reducing SEAD, there has been final agency action for which there is no other adequate remedy at law. Finally, plaintiffs' action is essentially one to "hold unlawful and set aside agency action, findings and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or, alternatively, "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A) & (D).

"The 'right of action' in such cases is expressly created by the Administrative Procedure Act (APA), which states that 'final agency action for which there is no other adequate remedy in court [is] subject to judicial review,' § 704, at the behest of '[a] person ... adversely affected or aggrieved by agency action.'" *Japan Whaling*, 478 U.S. at 230 n. 4, 106 S.Ct. at 2866 n. 4. (alterations in original).

No separate indication of congressional intent to create a private right of action is necessary. *Id.* Rather, there is a presumption *in favor of* judicial review that can be rebutted only if there is "clear and convincing" evidence of legislative intent to preclude review. *See e.g. Block v. Community Nutrition Inst.*, 467 U.S. 340, 345, 104 S.Ct. 2450, 2453, 81 L.Ed.2d 270 (1984). The clear and convincing evidence requirement is not meant in the strict evidentiary sense, but rather as "a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Id.* at 351, 104 S.Ct. at 2456.

The presumption in favor of judicial review is strong and well-established. The Supreme Court has noted that "judicial review of a final agency action will not be cut off unless there is persuasive reason to believe that such was the intent of Congress." *Bowen*, 476 U.S. at 670, 106 S.Ct. at 2135 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (citing cases)). Indeed, as the Court noted in *Bowen*, Committees of both Houses of Congress have endorsed this view. During the congressional term that resulted in the passage of the APA, the Senate Judiciary Committee commented:

Very rarely do statutes withhold judicial review. It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board.

*Bowen,* 476 U.S. at 670, 106 S.Ct. at 2136 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). These sentiments were echoed by the House of Representatives Committee on the Judiciary, which stated:

The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases. To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it. The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review.

476 U.S. at 671, 106 S.Ct. at 2136 (quoting H.R.Rep. No. 1980, 79th Cong., 2d Sess. 41 (1946)).

"Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block,* 467 U.S. at 345, 104 S.Ct. at 2453. In addition, congressional intent to preclude review may be inferred from contemporaneous judicial construction barring review and congressional acquiescence in it. *Id.* at 349, 104

S.Ct. at 2455. Thus, the task at hand is to examine BRAC's express language, legislative history, objectives, and statutory scheme "to determine whether Congress precluded all judicial review, and, if not, whether Congress nevertheless foreclosed review to the class to which the [plaintiff's] belong." *Id.* at 345–46, 104 S.Ct. at 2454 (quoting *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (opinion of Brennan, J.)).

In *Specter,* the Third Circuit considered whether Congress intended to preclude all review under BRAC. The Court engaged in an extensive issue-specific analysis of the availability of judicial review under BRAC. The Third Circuit began its discussion by noting two types of decisions under BRAC that were *not* subject to review. "We think it can be said with confidence," the court wrote, "that Congress intended no judicial review of decisions under the Act prior to the effective date of the President's decisions ..." and "of the manner in which the President has exercised his discretion in selecting bases for closure." *Specter,* 971 F.2d at 945–46. But, the fact that review was precluded under certain portions of the Act did not foreclose review under other portions of the Act;[6] the Court then proceeded to conduct an issue-specific analysis of reviewability. *Id.*

The *Specter* Court ultimately concluded that "[w]here the plaintiffs ask the court to substitute its political and military judgment for that of the Secretary and the Commission, their claims are not reviewable," but that "the plaintiffs do, however, ask for judicial review of issues that the judiciary is entirely competent to address."[7] *Id.* at 953. The claims that the

6. The court rejected defendants' argument that all review was precluded by the Act, finding that:

While defendants have pointed to plausible reasons why Congress might have decided to dispense with all judicial review not expressly authorized, nothing in the statute or its legislative history provides a basis for concluding with confidence that it actually decided to do so. As we shall see, there are some areas of decisionmaking under the Act in which Congress did not intend the courts to engage in second-guessing.... On the other hand,

there are other areas where our analysis leaves us with only the strong presumption favoring judicial review and no clear and convincing rebuttal.

*Specter,* 971 F.2d at 947.

7. The court gave an example of the type of claim that it believed was subject to judicial review. "To hypothesize the paradigm case," the court wrote, "if the Commission decided to dispense with public hearings in the interest of expedition, we could point to no clear and convincing evidence that Congress meant either to commit that decision to the Commission's dis-

court found reviewable included the claim that the Commission violated the provisions of the Act by holding closed-door meetings with the Navy before deciding which bases to recommend for closure, and the claim that the Secretary of Defense failed to meet his statutory obligation to create and transmit to the Commission and the GAO an administrative record containing all of the information he relied upon in making his recommendations.

I find the analysis and holding in *Specter* to be persuasive.[8] A review of BRAC reveals that there is nothing in its express language that would preclude review in this case, and defendants do not contend otherwise. Nor is there anything in BRAC's legislative history that would suggest that Congress intended to foreclose *all* judicial review of actions relating to the BRAC process. The reference in the House Conference Report to certain decisions which are beyond judicial review is, as the court in *Specter* found, certainly not clear and convincing evidence of congressional intent to preclude *all* review under the Act.[9] At most, a "fair reading [of the Report] reveals only an intent to preclude judicial review to the extent that there is not yet 'final agency action' to review." *Specter,* 971 F.2d at 949.

Defendants contend that Congress's failure to include a specific judicial review provision in BRAC indicates an intent to preclude review. According to defendants, Congress was aware that the Court of Appeals for the District of Columbia Circuit had held in June 1990, in *National Federation of Federal Employees v. U.S.* ("*NFFE*"), 905 F.2d 400, that plaintiffs in that action did not have standing to challenge the decision of the Secretary and the Commission to close or realign bases under the 1988 Base Closure and Realignment Act. This contention is without merit. Although defendants are correct that an intent to preclude review can be inferred from a contemporaneous judicial decision barring review and congressional acquiescence in it, the reviewability issue raised in *NFFE* and the issue raised in this action are sufficiently different that even if I were to assume that Congress acquiesced in the *NFFE* decision, I could not infer that Congress intended to bar review here.

In *NFFE,* unlike the situation in this action, the decision on the base closures and realignments that plaintiffs were challenging were made properly in accord with the procedures of the 1988 Act. Thus, in *NFFE* the plaintiffs' APA claim would have required the court to decide whether the Commission's recommendations were sound. In other words, in that case, "judicial review of the decisions of the Secretary

---

cretion or otherwise to preclude judicial review of it." *Specter,* 971 F.2d at 948.

**8.** In addition, at least one District Court has addressed the reviewability issue. The District Court for the District of Maine, adopted the Third Circuit's decision in *Specter* with respect to the question of reviewability, and found that plaintiffs' claim that the Secretary failed to transmit to the GAO, members of Congress and the Commission all of the information used in making the base closure recommendations was reviewable. *Cohen v. Rice,* 800 F.Supp. 999 (D.Me.1992).

**9.** The House Conference Report stated that:

The rulemaking (5 U.S.C. 553) and adjudication (5 U.S.C. 554) provisions of the Administrative Procedures Act (5 U.S.C. 551 et seq.) contain explicit exemptions for 'the conduct of military or foreign affairs functions.' An action falling within this exception, as the decision to close and realign bases surely does, is immune from the provisions of the

Administrative Procedures Act dealing with hearings (5 U.S.C. 556) and final agency decisions (5 U.S.C. 557). Due to the military affairs exception to the Administrative Procedures Act, no final agency action occurs in the case of various actions required under the base closure process contained in this bill. These actions therefore, would not be subject to the rulemaking and adjudication requirements and would not be subject to judicial review. Specific actions which would not be subject to judicial review include the issuance of a force structure plan under section 2903(a), the issuance of selection criteria under section 2803(b), the Secretary of Defense's recommendation of closures and realignments of military installations under section 2803(d), the decision of the President under section 2803(e), and the Secretary's actions to carry out the recommendations of the Commission under sections 2904 and 2905.

H.R.Conf.Rep. No. 923, 101st Cong., 2d Sess. 706 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2931, 3110; 3258.

and the Commission would necessarily involve second-guessing the Secretary's assessment of the nation's military force structure and the military value of the bases within that structure." 905 F.2d at 406.

In this case, however, the issue is not whether the Secretary's decision is militarily sound, but whether it was made in accordance with the requirements of BRAC. The distinction is crucial, because even if Congress intended to bar the type of claims raised in *NFFE*, that fact alone does not give rise to clear and convincing evidence that Congress intended to bar claims of noncompliance with the Act itself.

Finally, contrary to defendants' contention, the statutory framework created by BRAC reflects Congress's intent to allow judicial review of the type of claims raised here. When Congress enacted BRAC, the House Conference Report noted that there were two principal failures with the old system of base closures and realignments.

The conferees prescribe a new base closure process because closures and realignments under existing law have two failings. First closures and realignments take a considerable period of time and involve numerous opportunities for challenges in court. Second, the list of bases for study transmitted by Secretary Cheney on January 29, 1990, raised suspicions about the integrity of the base closure selection process. A new process involving an independent, outside commission will permit base closures to go forward in a prompt and rational manner.

H.R.Conf. No. 923 at 705, 1990 U.S.C.C.A.N. at 2931, 3257. In addition, BRAC itself states that "[t]he purpose of the this part is to provide a *fair* process that will result in the *timely* closure and realignment of military installations inside the United States." § 2901(b) (emphasis added).

These concerns led Congress to create a statutory scheme that prescribed specific procedural requirements for the base closure and realignment process. These procedural requirements gave the Secretary, the President, an independent BRAC Commission, and Congress some degree of discretion in the process. But it also stripped the Secretary of his unilateral authority to recommend military installations for closure and stripped Congress of its ability to block individual closures and realignments. Thus, two of BRAC's consequences were to create a system of shared power in which the ability of the Secretary to unilaterally decide to close or realign a base or of Congress to thwart the closing of a base was diminished, and to create an *exclusive* means for closing and realigning bases.

Plaintiffs claim here that, in spite of the balance of power created by BRAC, the Secretary unilaterally decided to virtually close SEAD after having determined that BRAC did not apply to the SEAD situation. In other words, plaintiffs contend that the Secretary illegally circumvented the BRAC process. Thus, unlike the case in which the Secretary uses the BRAC process and is then challenged on the ground that he did not comply with all of the procedural requirements of BRAC—which is, in part, what the plaintiffs in *Specter* charged—this action presents an even more basic question: were the defendants required to go through the *exclusive* BRAC process before taking the actions they did concerning SEAD.[10] Nothing in the Act or the

---

**10.** In this respect, this case is also quite different from one in which a party challenges the propriety of a closure or realignment decision that was made properly under BRAC. As the Third Circuit noted in *Specter:*

> [W]hile Congress did not intend courts to second-guess the Commander-in-Chief, it did intend to establish exclusive means for closure of domestic bases. § 2909(a). With two exceptions, Congress intended that domestic bases be closed only pursuant to an exercise of presidential discretion informed by recommendations of the nation's military establish-

ment and an independent commission based on a common and disclosed (1) appraisal of military need, (2) set of criteria for closing, and (3) data base. Congress did not simply delegate this kind of decision to the President and leave to his judgment what advice and data he would solicit. Rather, it established a specific procedure that would ensure balanced and informed advice to be considered by the President and by Congress before the executive and legislative judgments were made.

*Specter,* 971 F.2d at 947 (footnote omitted).

legislative history even remotely suggests that judicial review in such a circumstance would be precluded.

Indeed, it would be contrary to the purposes of the APA to allow the actions of an administrative agency, such as the Department of Defense, to escape judicial review simply because the agency declared that it had complied with its statutory obligations or that the statute did not apply at all.

The APA's review provision was intended to ensure agency compliance with relevant statutory obligations. In challenging defendants' actions, plaintiffs seek to protect the integrity of BRAC and to prevent defendants from circumventing the procedures and requirements of BRAC. Allowing judicial review in this case would ensure that the Secretary acted within his statutory authority. *See Natural Resources Defense Council, Inc. v. S.E.C.*, 606 F.2d 1031 (D.C.Cir.1979) (judicial review under NEPA will ensure SEC's statutory duties are implemented).

In sum, defendants have failed to demonstrate that Congress intended to preclude judicial review of the type of claims raised in this action. Therefore, I find that this court has the authority to review this action under the APA. 5 U.S.C. § 706(2)(A), (C) and (D).

### 5. *The Merits.*

I turn finally to the issue that lies at the heart of this motion: whether defendants should be preliminarily enjoined from proceeding with the restructuring at SEAD, and the concomitant reductions in civilian personnel. The standard for granting a preliminary injunction in this Circuit is, of course, well-known and long standing. "The issuance of a preliminary injunction requires the showing of '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'"

*Communications Workers of America v. Nynex Corp*, 898 F.2d 887, 891 (2d Cir. 1990) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

### A. Irreparable Harm

■ Plaintiffs contend that they will suffer irreparable injury if a preliminary injunction is not granted because hundreds of civilian employees will be discharged or forced to transfer to jobs outside of Seneca County, local businesses will lose government contracts and income generated by SEAD, and SEAD will lose the opportunity to obtain new missions, thereby assuring that it will be downsized without having been fairly assessed in the BRAC process. Plaintiffs also contend that if defendants are not now enjoined from proceeding with the reductions, this Court will be unable to render a meaningful decision on the merits.

Defendants disagree arguing that preliminary relief will not prevent the harm that plaintiffs allege they will suffer, nor preserve the status quo because SEAD's special weapons mission was eliminated on July 31, 1992, Declaration of James Davidson ("Davidson Decl.") at ¶ 18, SEAD is no longer receiving any new IPE rehabilitation work, and, in their view, neither mission can be revived. Defendants also contend that the threat of irreparable harm from the reduction-in-force has been diminished, if not eliminated, because the effective date of the RIF has been postponed by order of Secretary Stone to a date no earlier than February 11, 1993.[11] In addition, defendants note that preliminary injunctive relief is generally inappropriate in Government personnel cases, and that plaintiffs have an adequate and exclusive remedy for their challenge to the RIFs under the Civil Service Reform Act of 1978 ("CSRA"), Pub.L. No. 95–454, 92 Stat. 111 *et seq.* (codified, as amended, in various sections of 5 U.S.C.). Finally, defendants contend that plaintiffs have exaggerated both the extent of any harm that they may suffer and the extent

---

**11.** When plaintiffs first moved for preliminary relief, the RIF was scheduled to begin on November 13, 1992. On October 9, 1992, Secretary Stone announced that all civilian RIFs scheduled to begin on November 13, 1992, will instead begin no earlier than February 11, 1993.

to which a preliminary injunction can provide relief.

"An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456, 39 S.Ct. 142, 143, 63 L.Ed. 354 (1919)). "The purpose of a preliminary injunction," the Eleventh Circuit has noted, "is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United States v. State of Alabama*, 791 F.2d 1450, 1459 (11th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987).

" 'Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983) (quoting 11 Charles Wright & Arthur Miller, *Federal Practice and Procedure*, § 2948 at 431 (1973) (footnote omitted)). *Accord Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990). Whether a particular harm is irreparable turns on its imminence and the lack of an adequate remedy at law. *See Reuters*, 903 F.2d at 907 (citations omitted) ("Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages."). Finally, "[i]n making the determination of irreparable harm, both harm to the parties and to the public may be considered." *Long Island R.R. Co. v. International Assoc. of Machinists*, 874 F.2d 901, 910 (2d Cir.1989), *cert. denied*, 493 U.S. 1042, 110 S.Ct. 836, 107 L.Ed.2d 831 (1990).

Although courts have traditionally expressed a reluctance to issue a preliminary injunction in Government employee discharge cases, *see Sampson v. Murray*, 415 U.S. 61, 84, 94 S.Ct. 937, 950, 39 L.Ed.2d 166 (1974), there are circumstances that "may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n. 68, 94 S.Ct. at 953 n. 68. This case, which is much more involved than the usual garden-variety employee-discharge case, presents such an extraordinary circumstance.[12]

Several factors support this conclusion. First, although the RIF has been postponed, there is no indication that it will be cancelled. Moreover, despite the postponement, offers under the DOD's priority placement program are still continuing. Under the PPP, civilian employees registered to participate in the program were or soon will be required to decide, within 72 hours of receiving a job offer, whether they will accept the offer. If an employee declines the offer she will lose a variety of benefits, including severance and unemployment benefits, and, in some cases, the right to further participate in the PPP program. Similarly, many civilian employees will be forced to decide, sometime before the RIF becomes effective, whether they will participate in the voluntary early retirement program.

The civilian employees who will be faced with these decisions clearly face the threat of irreparable harm. *Cf. Chalk v. U.S. District Court Central District of California*, 840 F.2d 701 (9th Cir.1988) (teacher diagnosed as having AIDS suffered irreparable harm when he was reassigned to administrative position because harm went beyond question of compensation). The decision that these employees must make are life-altering decisions. "[C]ivilian employees are now being forced to make decisions as to whether they will leave their community, sell their homes, take their children out of schools and seek other employment within 72 hours," and also as to whether

---

12. Defendants contention that this action is barred by the CSRA is without merit. This action is one that challenges the defendants' compliance with the procedural requirements of BRAC, and NEPA, and, therefore, does not fall exclusively within the category of federal personnel actions.

"they are going to leave the employment of the Department of Defense entirely and take early retirement incentives." Affidavit of Bernard W. Hauf, Jr. ("Hauf Aff.") at ¶¶ 5 & 6. Many employees are facing the possibility of accepting a job they do not want or of losing valuable benefits. This is an injury that is real and imminent to the civilian employees, *see* Affidavit of Laurence Orndorff ("Orndorff Aff.") at ¶ 59, and one that goes beyond mere financial loss.

Second, the local community will suffer irreparable harm. According to the Affidavit of Eugen Baer ("Baer Aff."), the Chairman of the Seneca County Board of Supervisors, the reductions "will have a significant and dramatic negative impact on Seneca County." Baer Aff. at ¶ 2. Baer calculates that the RIF will result, *inter alia*, in a 30 percent drop in student enrollment in the Romulus Central School District, *id.* at ¶ 13, an emigration from Seneca of approximately 15 percent of its current population of 32,000, *id.* at ¶ 12, and a significant drop in property value. *Id.* at 15.

Third, and perhaps most significantly, if defendants continue to downsize SEAD, any final relief that plaintiffs may obtain could be rendered meaningless. Through this action, plaintiffs seek to prevent the personnel reductions and partial closure of SEAD on the grounds that the decision to do so was made in violation of BRAC. If plaintiffs prevail, defendants will be prevented from continuing with the restructuring and the RIF unless they comply with the BRAC process. In that case, SEAD will retain its civilian personnel and remain a functioning army depot. But if defendants are allowed to continue to restructure SEAD by dismantling its administrative structure, removing equipment, discharging the civilian employees, and downgrading it to a depot activity during the pendency of this action, plaintiffs' victory will be a hollow one.

Although SEAD's special weapons mission has been eliminated and its IPE rehabilitation mission has been relocated, SEAD is slated to perform 100 "work years"[13] of demilitarization work associated with the elimination of the United States's ground-launched nuclear missiles. Plaintiffs contend that SEAD could attract new missions if it is not downgraded to a depot activity, including additional demilitarization work, which it has performed in the past. Orndorff Aff. at ¶ 6. However, if defendants are allowed to continue to drastically alter SEAD, its ability to attract these new missions will be severely undermined, and the relief that could be afforded to plaintiffs would be short lived.

The reality of this harm is made evident by Laurence Orndorff, the Chief of Special Weapons at SEAD. According to Orndorff:

> If SEAD is to survive, it will be necessary for it to receive other military missions. The defendants' announcement that SEAD is being downgraded from depot to depot activity is having a detrimental effect on SEAD's ability to receive other missions. Attached hereto as Exhibit V is a June 18, 1992 Draft Memorandum from Headquarters AMC discussing a mission involving demilitarization of depleted uranium munitions. The recommendation of such memorandum is that such activity should be directed to SEAD or Sierra. However, because of the downgrading of Seneca from depot to depot activity, Seneca may lose this opportunity. Attached hereto as Exhibit W is a August 12, 1992 Memorandum for the Record prepared by Kenneth P. Muehl, DESCOM. In such memorandum Mr. Muehl states 'SEAD will become a depot activity under Letterkenny Army Depot. The concept of Depot Activities operation is long-term storage with minimal receipt, issue, maintenance, and demil. Certainly not assigning a new unique mission to a depot activity.' Therefore, Mr. Muehl recommends that SEAD not receive this important new mission.

Orndorff Aff. at ¶ 60.

Finally, if defendants are allowed to continue with planned activities during the

---

**13.** A "work year" is the amount of work that a worker performs in one year. Consequently, 100 "work years" is the amount of work that 100 workers perform in one year.

pendency of this action that are ultimately found to be in violation of BRAC, allowing them to do so would serve only to undermine the integrity of the BRAC process, which, in turn, would ultimately harm the public interest. For the BRAC process to work as intended, the Secretary cannot deplete a military installation of its equipment and missions before it is evaluated by the BRAC commission. Yet, if defendants are allowed to continue to downsize SEAD, but plaintiffs ultimately prevail, SEAD will never have been fairly evaluated under the BRAC process, and Congress's intent would have been frustrated.

I am, of course, mindful of the possible harm that defendants may sustain as a result of issuing a preliminary injunction, and that such harm is relevant to the analysis. In this case, however, it is clear that the threat of harm to plaintiffs if an injunction is not issued far outweighs the harm to defendants in maintaining the status quo during the pendency of this action.

In sum, I find, based on the affidavits and other materials submitted by plaintiffs, that they have made a showing of irreparable harm if the injunction is not issued now.

B. Likelihood of Success on the Merits or Sufficiently Serious Questions Going to the Merits

1. *Application of BRAC*

■ The question at the heart of this action is whether BRAC applies to the types of reductions authorized by the Secretary at SEAD. In order for plaintiffs to prevail on their claim under BRAC, they must establish that defendants are required to go through the BRAC process before they start the drastic reductions planned at SEAD. Plaintiffs contend that the Act applies because its numerical threshold has been met. Defendants strenuously disagree, arguing that the Act does not apply because the number of civilian

personnel positions reduced as a result of the "realignments," as that term is defined in BRAC and 10 U.S.C. § 2687 ("section 2687"), has not reached the numerical threshold that would require BRAC's application.

After reviewing the relevant language in BRAC, section 2687, the legislative history of each statute, and the many documents submitted by the parties, I find that plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim under BRAC. The reduction in civilian personnel that will be caused by the Secretary's actions at SEAD is sufficiently large that BRAC's numerical threshold has been easily satisfied. *See* 10 U.S.C. § 2687(a)(2). The elimination of the special weapons mission, the consolidation of the IPE maintenance function at DLA facilities, and the plan to downgrade SEAD from a depot to a depot activity will reduce the number of authorized civilian personnel by 562 positions, which is a reduction of nearly 70 percent of the 847 civilian personnel authorized to be employed at SEAD, Complaint at Ex. F;[14] that drastic reduction is sufficient to trigger BRAC. In my view, it is precisely this kind of action that prompted Congress to enact BRAC in the first place.

The task of resolving whether BRAC applies here "begins where all such inquiries must begin: with the language of the statute itself." *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). If the "statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Estate of Cowart v. Nicklos Drilling Co.*, —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). *Accord Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter;

**14.** The planned reductions at SEAD, while cutting current civilian employment levels by 562 employees, will actually eliminate 639 permanent civilian personnel *positions*. Complaint, Ex. E. According to plaintiffs, there are now 924 authorized civilian personnel positions at SEAD. Orndorff Aff. at ¶ 54. Thus, the planned restructuring will result in the elimination of 66 percent of the number of civilians now employed at SEAD and 69 percent of the authorized civilian positions.

for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *Japan Whaling,* 478 U.S. at 233, 106 S.Ct. at 2867.

In ascertaining the plain meaning of the statute, the court must look not only to the particular statutory language but also to the "design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). *Accord Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) (courts look not only to the language of the statute, but also to the design of the statute as a whole and to its object and policy).

Congress enacted BRAC to provide "a fair process that [would] result in the timely closure and realignment of military installations in the United States." BRAC § 2901(b). To this end, BRAC provides that it is the *exclusive* authority for closing and realigning military installations in the United States. *See* BRAC § 2909(a) & (b). BRAC does, however, create an exception for those closures or realignments to which section 2687 does not apply. *See* BRAC § 2909(c). BRAC provides in pertinent part:

(a) In general. Except as provided in subsection (c), during the period beginning on the date of the enactment of this Act and ending on December 31, 1995, this part shall be the exclusive authority for selecting for closure or realignment, or for carrying out any closure or realignment of, a military installation inside the United States.

(b) Restriction. Except as provided in subsection (c), none of the funds available to the Department of Defense may be used, other than under this part, during the period specified in subsection (a)—

(1) to identify, through any transmittal to the Congress or through any other public announcement or notification, any military installation inside the United States as an installation to be closed or realigned or as an installation

under consideration for closure or realignment; or

(2) to carry out any closure or realignment of a military installation inside the United States.

(c) Exception. Nothing in this part affects the authority of the Secretary to carry out—

(1) closures and realignments under title II of public Law 100–526 [note to this section]; [15] and

(2) closures and realignments to which section 2687 of title 10, United States Code, is not applicable, including closures and realignments carried out for reasons of national security or a military emergency referred to in subsection (c) of such section.

BRAC § 2909(a), (b), & (c).

Section 2687, which was originally enacted in 1977, provides:

Notwithstanding any other provision of law, no action may be taken to effect or implement—

(1) the closure of any military installation at which at least 300 civilian employees are authorized to be employed;

(2) any realignment with respect to any military installation referred to in paragraph (1) involving a reduction by more than 1,000, or by more than 50 percent, in the number of civilian personnel authorized to be employed at such military installation at the time the Secretary of Defense of the Secretary of the military department concerned notifies the Congress under subsection (b) of the Secretary's plan to close or realign such installation.

10 U.S.C. § 2687(a).

Thus, read in connection with section 2687, BRAC plainly states that it is the exclusive authority for closing military installations at which more than 300 civilian employees are authorized to work and for realignments involving a reduction by more than 1,000, or by more than 50% of the civilian personnel authorized to be employed at the installation. The "downsizing" at SEAD will result in the reduction of

---

**15.** This is a reference to the bases authorized to be closed or realigned under the 1988 Act.

more than 50 percent of the number of civilian personnel authorized to be employed there.

■ Defendants nevertheless maintain that BRAC does not apply. They contend that the number of civilian personnel being discharged by the elimination of the special weapons mission, which accounts for 442 of the 639 personnel positions being eliminated, should *not* be included in calculating the number of civilian personnel being reduced as a result of a "realignment."

Defendants contend that the "elimination" of the special weapons mission cannot be characterized as a "realignment," as that term is defined in BRAC and section 2687, because the mission is being "eliminated" but not "relocated."

I am not persuaded by this argument. I do not believe that the fact that a function or mission is "eliminated" as opposed to "relocated" makes a material difference. No matter how you characterize it, the result is the same. Because the President and the Secretary have determined to eliminate the storage and maintenance of a certain type of weapon, approximately 560 civilian employees at this installation face termination. The Army is certainly not going out of business. Only one of its many functions has been altered. In my view, that fact alone does not justify the Secretary's disregard for the BRAC requirements.

BRAC and section 2687 define "realignment" as follows: "The term 'realignment' includes any action which both reduces and relocates functions and civilian personnel positions but does not include a reduction in force resulting from workload adjustments, reduced personnel or funding levels, or skill imbalances." BRAC § 2910(5); *accord* 10 U.S.C. § 2687(e)(3). Defendants contend that to fall within the definition of "realignment," an action must *both* reduce *and* relocate functions and civilian person-

nel positions. They claim that if an action does not do both then it is not a realignment, and the number of civilian personnel or personnel positions affected by it should not be included in determining whether section 2687's threshold has been met. Consequently, under defendants' calculation, the number of civilian personnel positions or personnel positions being reduced by actions that can be characterized as a "realignment" is, at most, only 197, which is less than the 50 percent threshold requirement.

I disagree with defendants' interpretation of the term "realignment." Even if I accept as true defendants' contention that the special weapons mission is not being relocated to another installation,[16] their interpretation of BRAC's requirements is based on a narrow and strained reading of the statutory language. Moreover, to confine the definition of "realignment" to the narrow category that defendants propose would produce a result that is contrary to the plain language of BRAC and section 2687 and would be inconsistent with the congressional intent underlying both statutes.

The first difficulty with defendants' argument is that it ignores Congress's use of the word "includes" in the definition of "realignment" in section 2687, as originally enacted in 1977, and as amended in 1990, and in BRAC. That Congress chose to use the word "includes" rather than the word "means" in this definitional section is most instructive, because "in construing a statute [courts] are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979).

When interpreting a statute, it is important to keep in mind "the cardinal rule that a statute is to be read as a whole, since the

---

16. Plaintiffs strenuously disagree with defendants' contention that the special weapons mission is not being relocated. Plaintiffs, relying on the affidavit of Laurence Orndorff, contend that the special weapons mission is being relocated to Sierra Army Depot in Herlong, California. Defendants deny this, arguing that plain-

tiffs are relying on outdated information. Because for this motion I am proceeding under the assumption that the mission is not being relocated, I need not address this issue at this time. Moreover, as is discussed below, whether the mission was relocated or eliminated is not a decisive factor in this case.

meaning of the statutory language, plain or not, depends on context. 'Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.' " *King v. St. Vincent's Hospital,* —— U.S. ——, ——, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941)) (other citations omitted).

Generally, when a statute uses the word "includes" to a define a term, it leaves open the possibility that the term encompasses *more* than those examples specifically enumerated in the definition. *Federal Election Commission v. Massachusetts Citizens for Life,* 769 F.2d 13, 17 (1st Cir. 1985), *aff'd* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). *See also Highway & City Freight Drivers, Etc. v. Gordon Transports, Inc.,* 576 F.2d 1285, 1289 (8th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 678 (1978) (When a statute uses the word "includes" rather than "means," the fact that the statute does not specifically mention a particular condition does not imply that the condition falls outside the definition.); *Winterrowd v. David Freedman and Co., Inc.,* 724 F.2d 823, 825 (9th Cir.1984) (phrase "and includes" is expansive and not limiting); *United States v. City of New York,* 481 F.Supp. 4, 6 (S.D.N.Y.) (word "includes" is usually a term of enlargement, and not of limitation), *aff'd* 614 F.2d 1292 (2d Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980). As the First Circuit has noted:

> A term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning by construction than where the definition declares what a term 'means.' It has been said the word 'includes' is usually a term of enlargement, and not of limitation ... It, therefore, conveys the conclusion that there are other items includeable, though not specifically enumerated ...

*Federal Election Commission,* 769 F.2d at 17 (quoting 2A N. Singer, *Sutherland Statutes and Statutory Construction* 133 (4th ed. 1984) (quoting *Argosy Ltd. v. Hennigan,* 404 F.2d 14, 20 (5th Cir.1968))) (alterations in original).

What is particularly revealing in this case is that Congress used the word "means" in every other definition in section 2687 when it first enacted it in 1977 and when it amended it in 1990, as well as in every other definition in section 2910 of BRAC. For example, both BRAC and section 2687, as amended in 1990, define the term "military installation" as follows:

> The term 'military installation' *means* a base, camp, post, station, yard, center, homeport facility for any ship, or other activity under the jurisdiction of the Department of Defense, including any leased facility. Such term does not include any facility used primarily for civil works, rivers, and harbors projects, flood control, or other projects not under the primary jurisdiction or control of the Department of Defense.

BRAC § 2910(4) and 10 U.S.C. § 2687(e)(1) (emphasis added). Additionally, section 2687, as originally enacted, defined the term "civilian personnel" as follows: " 'Civilian Personnel' *means* direct-hire permanent civilian employees of the Department of Defense." P.L. 95–82, § 612, 91 Stat. 379 (1977) (emphasis added). Yet, when Congress defined the term "realignment" it used the word "includes."

That Congress defined all other relevant terms using the word "means" but defined the term "realignment" using the word "includes," suggests strongly that it intended the definition of "realignment" to be expansive rather than limiting, for "[i]t is presumable that Congress legislates with knowledge of our basic rules of statutory construction ..." *McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 499, ——, 111 S.Ct. 888, 898, 112 L.Ed.2d 1005 (1991). It also diminishes the possibility that Congress used the word "includes" inadvertently. " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello*

*v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972). *See also U.S. v. Gertz,* 249 F.2d 662, 666 (9th Cir.1957) (the word "includes" is usually a term of enlargement especially if the word "means" is used elsewhere in same statute); *City of New York v. Exxon Corp.,* 697 F.Supp. 677, 684–85 (S.D.N.Y.1988) (Congress's use of the word "means" in one definition and word "includes" in another definition strengthens conclusion that the latter was meant as a term of enlargement). To read the word "includes" as a term of limitation "would render Congress' use of different terminology in each definition meaningless." *City of New York,* 697 F.Supp. at 685.

The legislative history of section 2687 buttresses the conclusion that the term "realignment" should be read expansively rather than restrictively. The definition used in BRAC and amended section 2687 was derived from section 2687, Pub.L. No. 95–79, § 612, 91 Stat. 358, 379 (1977), as originally enacted in 1977. But section 2687 was not Congress's first attempt to regulate the base realignment process. Enactment of section 2687 was preceded a year earlier, in 1976, by the enactment of section 612 of Military Construction Authorization Act for 1977 ("MCAA"), Pub.L. No. 94–431, § 612, 90 Stat. 1349, 1366 (1976).[17] Section 612 provided in pertinent part:

(a) notwithstanding any other provision of law, no funds authorized to be appropriated in this Act may be used to effect or implement—

(1) the closure of any military installation;

(2) any reduction in the authorized level of civilian personnel at any military installation by more than one thousand civilian personnel or 50 per centum of the level of such personnel authorized as of March 1, 1976, or the end of the fiscal year immediately preceding the fiscal year in which the Secretary of Defense or the Secretary of the military department concerned notifies the Congress that such installation is a candidate for closure or significant reduction, whichever occurs later; or ...

Pub.L. No. 94–431, § 612(a).

Unlike section 2687, section 612 did not contain a definition of the term realignment, but the entire section was entitled "Base Realignment," implying that by the term "realignment" Congress meant both closures of military installations and reductions in personnel. *See I.N.S. v. National Center for Immigrants' Rights,* —— U.S. ——, ——, 112 S.Ct. 551, 556, 116 L.Ed.2d 546 (1991) ("the title of a statute can aid in resolving an ambiguity in the legislation's text"); *Berniger v. Meadow Green–Wildcat Corp.,* 945 F.2d 4, 9 (1st Cir.1991) ("It is well established that a statute's title may aid in construing any ambiguities in a statute."). Significantly, section 612 contained no reference to a relocation of functions or civilian personnel positions. The focus of the section was on closures and reductions in civilian personnel positions.

The following year, in 1977, Congress sought to enact legislation that would put in place a permanent base realignment process. The result was section 2687. Section 2687 was substantially similar to section 612. When the bill that contained section 2687 was being considered by the Senate, Senator Strom Thurmond noted:

A significant feature of this bill is the base realignment provision which is very similar to that enacted in the Senate last year. The difference would be that the

---

**17.** After it was first passed by Congress, the MCAA was vetoed by President Ford because of the inclusion of section 612. President Ford was concerned about protecting the power of the Executive to "change or reduce the mission at any military installation if and when that becomes necessary." Letter from President Ford to the House of Representatives dated July 2, 1976 *reprinted in* S.Rep. No. 1233, 94th Cong., 2d Sess. 5 (1976). The House of Representatives voted to override the veto but the Senate voted to sustain it. Section 612 was then amended to make it effective for only one year, rather than for five years as provided for originally, and the requirement for a minimum study period of 9 months was removed. The MCAA, with the amended section 812 was then passed and signed by the President.

current amendment makes this provision permanent law ...

123 Cong.Rec. 14,683 (1977). Significantly, section 2687 retained section 612's numerical thresholds for reductions in civilian personnel.

One apparent difference, though, between section 2687 and section 612, is that the former prohibited "realignments" while the latter prohibited "reductions." But the difference is more illusory than real; for when the term "realignment" is read in light of section 612's use of the term to encompass both closures and reductions, and section 2687's use of the word "includes" to define the term "realignment," it becomes apparent that Congress did not intend to restrict the meaning of the term to only those situations enumerated in the definition. Rather, the use of the term "realignment" and its definition were intended to expand the scope of the prohibition of section 2687 to include situations in which actions resulted in both reductions and relocations of functions and civilian personnel positions. Had Congress intended a more restrictive meaning of the term, as defendants argue, it presumably would have used the word "means" as it did as to other terms, since it undoubtedly was aware of section 612 and its use of the term "realignment" when it enacted section 2687. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85, 108 S.Ct. 1704, 1712, 100 L.Ed.2d 158 (1988) ("we generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.")[18]

In sum, the plain language of section 2687 and BRAC, traditional rules of statutory construction, and the legislative history of both statutes all suggest strongly that the term "realignment" should not be confined and restricted as the Secretary contends.

Defendants also contend that the elimination of the special weapons mission is a "workload adjustment," and, therefore, specifically excluded from the definition of the term "realignment." Relying on the Declaration of James Davidson, the Chief of the Base Realignment and Closure Office in the Headquarters of the AMC, defendants argue that because the special weapons mission was eliminated as a direct result of President Bush's directive to eliminate the United States's entire inventory of ground-launched nuclear missiles, the action is properly categorized as a workload adjustment.[19]

This contention is without merit. First of all, there is no definition of "workload adjustment" in BRAC and the legislative history does not address its meaning. By itself, the phrase is broad enough to include almost anything that the Army or the Department of Defense elect to do concerning utilization of its civilian work force. It would, however, be a mistake to view this phrase in isolation from the rest of BRAC and its legislative history. If what is proposed for SEAD excuses the Army from complying with BRAC, then I believe that the Army and the Secretary of Defense can act with impunity when making significant personnel reductions throughout the country.

The design and purpose of BRAC and the concerns expressed throughout the Act's legislative history, all suggest that the BRAC process was meant to apply whenever reductions in personnel of this magnitude are caused by the Government's actions. The fact that the President chose to eliminate one type of weapon from the Army's arsenal does not relieve the Government from complying with BRAC when

---

**18.** In addition, the presence of the second clause in the definition of section 2687 as originally enacted, which states that a realignment "does not include a reduction in force resulting from workload adjustments, reduced personnel or funding levels, skill imbalances, or other similar causes," makes it more logical to read the first clause as expanding rather than limiting the definition of "realignment."

**19.** According to Davidson:

A workload adjustment is a change in the requirement for a key work output or product of an installation due to either of the following circumstances: (1) reduced or canceled customer demand for the work output/product, and (2) reduced or canceled funding by the customer for the work output/product. Davidson Decl. at ¶ 26.

that action, together with other contemporaneous actions, causes the elimination of nearly 70 percent of an installation's civilian work force and permanent civilian positions.

It would be anomalous, in light of Congress's clearly expressed concern about the effects of large-scale reductions, if the term "realignment" did not include the elimination of a mission that reduced civilian personnel by more than 50 percent, as is the case here, even though there is no corresponding relocation of the function and even if it is euphemistically referred to as a "work adjustment."

Congress clearly demonstrated that by enacting section 612 and section 2687 it was targeting *reductions* in civilian personnel. For example, when section 2687 was enacted, the House Armed Services Committee noted in its report that "[t]hese procedures establish a precise reporting requirement for the armed services to follow in any decision to close a military installation or *greatly reduce* civilian employment at an installation." H.R.Rep. No. 290, 95th Cong. 1st Sess. 6 (1977) U.S.Code Cong. & Admin.News 1977, p. 542 (emphasis added). Additionally, as noted above, section 612(a) defines the relevant actions that it was prohibiting as (1) closures of military installations and (2) *"reductions* in the authorized level of civilian personnel ..." (emphasis added). Finally, although it uses the term realignment, section 2687 uses as a threshold for application a *reduction* in civilian personnel of more than 1,000 or more than 50 percent.

Congress's concern over large-scale reductions in civilian personnel was predicated on its belief that such reductions had a significant negative impact on both the discharged employees and the local communities. When section 2687 was enacted, the Senate Armed Services Committee noted that "[t]he committee feels strongly that major base realinements do have significant impact on the surrounding community and therefore decisions concerning base realinements should be made carefully and with adequate public participation. Permanent law in this regard is considered appropriate." S.Rep. No. 125, 95th Cong. 1st Sess. 4 (1977) U.S.Code Cong. & Admin.News 1977, pp. 542, 543. It later noted that "realinements that may well be justified cannot be made indiscriminately until there has been adequate consideration of the adverse impacts of the action on the surrounding community and the possibilities to mitigate these impacts has been adequately explored." *Id.* at 5, U.S.Code Cong. & Admin.News 1977, pp. 542, 544.

In addition, "[t]he legislative history of [BRAC] demonstrates Congress' sensitivity to the impact of a base closing on the employees of the base and the community in which they live." *Specter,* 971 F.2d at 943. This concern was echoed in the express language of the Act, which required that the BRAC Commission conduct public hearings on the Secretary's recommendations. BRAC § 2903(d)(1). By requiring public hearings, Congress opened up the base closure and realignment process to public scrutiny and input, and gave local communities an opportunity to voice their concerns. The 1991 BRAC Commission traveled to numerous sites and met with members of various local communities that would be affected by the recommended closures and realignments. According to the letter that accompanied the Commission's 1991 Report, the Commission "held 28 hearings across the United States, visited 47 military installations and met face-to-face with hundreds of representatives of the surrounding communities." Complaint, Ex. A, Letter of the 1991 BRAC Commission dated July 1, 1991.

In fact, concern for the "economic impact on local communities" was one of the factors established by the Secretary of Defense, and left unaltered by Congress, that the BRAC Commission is required to consider in evaluating the Secretary's closure and realignment recommendations. Complaint, Ex. A at C–1; *accord Specter,* 971 F.2d at 943.

In this case, because the BRAC process was circumvented, the economic impact on Seneca County of the massive reduction in civilian personnel at SEAD was never evaluated by an independent reviewing body,

such as the BRAC Commission. Yet, according to plaintiff, the economic impact on Seneca County will be severe. Plaintiffs allege that Seneca County, its businesses, and residents will suffer a substantial drop in spending and revenue. According to plaintiffs' calculations, at current employment levels, SEAD has an annual financial impact on Seneca County of approximately 134.2 million dollars. Plaintiffs also estimate a substantial drop in the approximately 27 million dollars spent by SEAD employees in the neighboring six-county area. In addition, the Romulus Central School District, which will suffer close to a 30 percent drop in enrollment, is expected to lose approximately $478,000 in federal aid and a potential loss of $98,932 in state aid. Baer Aff. at ¶¶ 8, 10 and 14. Plaintiffs also allege that SEAD currently operates water and sewer systems that supply such services to the neighboring towns of Varick and Romulus, and it is unclear whether these services will continue. Finally, plaintiffs allege that it is unclear whether they will lose the backup services provided by the SEAD fire department. *Id.* at ¶¶ 16 and 17.

In light of the clear concern that Congress has expressed regarding consideration and mitigation of the negative economic impact on local communities, it would indeed be odd if the Secretary were able to circumvent the BRAC process, despite the significant impact that the reduction of over 560 civilian employees will have on the Seneca County community, simply because he has termed his actions as a "reduction" or a "work-load adjustment" as opposed to a "realignment."

In short, there is simply no sound basis to be found in the express language of BRAC or section 2687 that would support differentiating between reductions in personnel caused by elimination of missions and functions and those caused by relocation of missions and functions.

Furthermore, the design and object of BRAC support curtailing rather than expanding the Secretary of Defense's discretion in deciding which military installations should be closed or realigned. The legislative history of BRAC and the framework it created demonstrate that in enacting BRAC, Congress was motivated in large part by a belief that the Secretary of the Defense should not be given the unilateral authority to select installations that would be recommended for closures and realignments. In enacting BRAC, Congress used as its model the 1988 Base Closure and Realignment process. The House Report accompanying BRAC noted:

> The last two years have provided examples of both the right way and the wrong way to close bases. The establishment of the Defense Commission on Base Realignment and Closure in 1988 is an example of the right way to close bases. Under this plan, a highly respected, bipartisan commission recommended bases for realignment or closure based on a number of neutral and widely endorsed criteria. Congress had the opportunity to accept or reject the recommendations as a whole. Once Congress failed to reject the recommendations of the Commission, their implementation was automatic.

> Secretary Cheney's announcement of candidates for base closure on January 29, 1990, was an example of the wrong way to close bases. The Secretary's list focuses on bases in the United States. The sharpest reductions in American forces are likely to be overseas. It is hard to justify a large number of domestic base closures unless overseas bases are closed at the same time.

H.R.Rep. No. 665 at 341–42. *See also* H.R.Conf.Rep. No. 923 at 705, U.S.Code Cong. & Admin.News 1990, pp. 2931, 3067, 3068, 3110, 3257.

Through BRAC, Congress circumscribed the Secretary's ability to select bases for realignment and closure by vesting some of that authority in the BRAC Commission. BRAC expressly provides that the Commission may reject the Secretary's recommendation to close or realign a base if the

recommendation deviates from the Secretary's force-structure plan and final criteria. BRAC § 2903(d)(2)(B).

In addition, Congress enacted BRAC, in part, because the existing base closure process, which was often delayed by challenges in court and other obstacles, was deemed inadequate. As the House Conference Report noted "closures and realignments take a considerable period of time and involve numerous opportunities for challenges in court." H.R.Conf.Rep. No. 923 at 705, U.S.Code Cong. & Admin.News 1990, pp. 2931, 3257. Indeed, Congress passed the 1988 Act primarily because, as the House Report noted, "[i]n testimony before the committee, Honorable Frank C. Carlucci, Secretary of Defense, stated that the Department of Defense is unable to close or realign unneeded military installations because of impediments, restrictions, and delays imposed by provisions of current law." H.R.Rep. No. 735(I), 100th Cong., 2d Sess. 8 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3355, 3356.

By unilaterally "downsizing" SEAD without going through the BRAC process, defendants precipitated just the type of response that BRAC was meant to prevent. Their acts galvanized politicians with ties to SEAD to take action to prevent the closure of the base.

Defendants also contend that requiring the Secretary to go through the BRAC process infringes on the President's ability to eliminate our arsenal of ground-launched nuclear missiles. This contention is without merit. This court could not, nor would it want to, command the President to bring back the nuclear missiles. But that is not the relevant issue. Rather, it is whether the Secretary can realign a military installation without going through BRAC. The answer to that question is a resounding "no" if the realignment meets the numerical threshold of section 2687. The President's decision to eliminate ground-launched nuclear missiles does not vest the Secretary with *carte blanche* authority to circumvent BRAC. If that were the case,

the Secretary could close a base at any time without going through the BRAC process if the closure or realignment were deemed a direct result of a Presidential decision to cut troop strength, eliminate a squadron of planes, or phase out a particular type of weapon.

■ For similar reasons, defendants' contention that each action, i.e. the elimination of the special weapons mission, the consolidation of the IPE rehabilitation mission, and the downgrading to a depot activity, should be considered separately rather than collectively is also without merit. Allowing the Secretary to isolate certain segments of a realignment in order to discount the number of civilian positions affected would create a giant loophole in the process. The Secretary could define away a massive reduction in the number of civilian personnel authorized at a base by categorizing large portions of the action as "reductions" rather than "realignments." To give the Secretary that power simply by dint of semantics is contrary to the expressed intent of Congress to preclude the realignment of a military installation involving a reduction of more than 1,000 or more than 50 percent of the civilian personnel authorized to be employed at a base.

In sum, after reviewing the plain language of BRAC and section 2687 and the legislative history of the two statutes, I find that plaintiffs have demonstrated a likelihood of success on the merits. Based on the statutory language and legislative history there is significant textual support for their claim that defendants were required to go through the BRAC process to effect the type of realignment currently proposed for SEAD.

### 2. *Application of NEPA*

Plaintiffs also claim that defendants should be enjoined because they did not comply with the requirements of NEPA. Specifically, plaintiffs contend that defendants did not prepare an environmental impact statement ("EIS") or an environmental assessment ("EA") as required by NEPA. *See* 42 U.S.C. § 4332(2)(C).[20] Defendants

---

**20.** Section 4332 provides in relevant part:
[A]ll agencies of the Federal Government shall—

. . . . .

(C) include in every recommendation or report on proposals for legislation and other

strenuously disagree, arguing that NEPA does not require an EIS or an EA because the Army properly determined that the SEAD reductions would not have significant environmental consequences.

Because I have decided that plaintiffs have demonstrated a likelihood of success on the merits on their claim under BRAC, I need not address their NEPA claim at this time. BRAC expressly provides that "[t]he provisions of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*) shall not apply to the actions of the President, the Commission, and, except as provided in paragraph (2), the Department of Defense in carrying out this part." BRAC § 2905(c)(1). Consequently, to the extent that defendants are prohibited from acting without going through BRAC, plaintiffs' claim that defendants have also failed to comply with NEPA is premature.

## CONCLUSION

Because plaintiffs have demonstrated the threat of irreparable harm and a likelihood of success on the merits, their motion for preliminary injunctive relief under Fed. R.Civ.P. 65 is granted. I have considered the competing interests of the parties and I decline to require plaintiffs to post a bond. In addition, because of the nature of this action, the Court will hear all dispositive motions and set a trial date on an expedited basis.

Therefore, based on this decision:

IT IS HEREBY ORDERED that plaintiffs' motion for a preliminary injunction is granted and that pending the conclusion of this action or until further order of the Court, defendants are enjoined as follows:

(1) Defendants, and their agents, servants, officers, and employees, and those persons in active concert or participation with them, are ordered to cease any further action to implement the plan to realign, restructure, eliminate or reduce functions or missions at the Seneca Army Depot as approved on July 2, 1992 by the Secretary of the Army when he approved the AR 5-10 report concerning the Depot; and

(2) Defendants are enjoined from directly or indirectly discharging, requiring the retirement of, or reassigning any civilian personnel authorized to be employed at Seneca Army Depot as of July 1, 1992, or from taking any steps and spending any money to reduce the number of civilian personnel positions authorized at Seneca Army Depot to an amount below the number authorized by the Department of Defense as of July 1, 1992.

IT IS SO ORDERED.

major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.